# CASES IN CHANCERY

## DELAWARE

ALLIED CHEMICAL & DYE CORPORATION, a corporation of the State of New York, and BY-PRODUCTS COKE CORPORATION, a corporation of the State of New York (Intervenor),

*vs.*

THE STEEL AND TUBE COMPANY OF AMERICA, a corporation created by and existing under the laws of the State of Delaware, CLAYTON MARK, HERBERT H. SPRINGFORD, ARMIN A. SCHLESINGER, HARRISON WILLIAMS, W. M. L. FISKE, EDWARD G. WILMER, LEONARD KENNEDY, ANSON MARK, CHARLES F. FAWSETT, GEORGE P. MILLER, FRANK F. CORBY, ADDISON H. BEALE, D. R. McLENNAN, HARRY COULBY, CHARLES T. BOYNTON, CLINTON S. LUTKINS, E. D. WINKWORTH and C. D. CALDWELL, Directors of the said The Steel and Tube Company of America; CLARENCE DILLON, ROLAND L. TAYLOR, JOSEPH H. SEAMAN, JOHN W. HORNER, JR., JAMES DEAN, R. W. MARTIN, WILLIAM A. PHILLIPS, W. M. L. FISKE, WILLIAM A. READ, JR., E. J. BERMINGHAM and J. V. FORRESTAL, co-partners doing business under the firm name and style of Dillon, Read & Company; CLARENCE DILLON, ARMIN A. SCHLESINGER, HERBERT H. SPRINGFORD and EDWARD G. WILMER, as Trustees, and THE YOUNGSTOWN SHEET & TUBE COMPANY, a corporation created by and existing under the laws of the State of Ohio.

*New Castle, March 28, 1923.*

A corporation organized under the General Corporation Law is subject to provisions written into the law prior to its incorporation.

Under *General Corporation Law* as amended by 29 *Del. Laws, c.* 113, § 64a, relating to the sale of assets and franchises, two things with respect to a sale are contemplated: (a) An authorization of the sale by the stockholders, the will of the majority being absolute in so far as the fact of the sale and whether one should be made is concerned; and (b) a fixing of terms and conditions by the directors who must honestly and in good faith determine upon such terms and conditions as they deem expedient for the best interest of the corporation and fair to the minority stockholders.

When it appears that a majority of the stockholders pursuant to *General Corporation Law,* as amended by 29 *Del. Laws,* c. 113, § 64a, have sought to impose their will upon the minority, it is competent for any one who conceives himself aggrieved thereby to invoke the processes of a court of equity for protection, which court will grant a restraining order if it appears that any of those fundamental principles of equity have been violated.

The requirements of *Section 64a* of the *General Corporation Law* dealing with the subject of the sale of corporate assets and of the certificate of incorporation being satisfied, fraud is the only ground of relief to which a complaining stockholder can resort in opposition to the exercise of the power of sale given by said section.

When the majority stockholders pursuant to a statutory power seek to impose their will upon the minority, they assume a fiduciary relationship, and, when they so use their power for the advantage of themselves at the expense of the minority, their conduct is fraudulent and relief for the minority may be had in equity, though not every personal advantage which the majority secures is to be regarded as vitiating in character.

Where the advantage gained is in no wise connected or associated with the assets, but is purely incidental and collateral, no vitiating circumstances can be deduced therefrom.

Whether a contemplated sale of all the assets of a corporation should be made, and, if so, whether the terms are fair, can in no wise be determined with respect to the fact that, upon dissolution, the preferred stock will be redeemed at 110 per cent. par, since the articles of incorporation assured to the preferred stockholders such a price upon dissolution, nor would the fact that the control of the corporation was dominated by the holders of the preferred stock who as such would be most benefitted by such a distribution, nor the fact that the majority voting for the sale would by reason of an advantageous purchase receive a greater profit on their common stock than the minority stockholders, constitute such a personal interest as to vitiate the sale.

In examining the question of the fairness of a proposed sale of corporate assets authorized by vote of a majority of the stockholders, the court will not inquire into the individual and personal motives actuating each stockholder in the casting of his vote in favor of the sale.

Syllabus.

The fact that one of the managers of a syndicate, which having the control of a particular corporation, is negotiating a sale of all its assets in such a way that the preferred stock of the corporation will be redeemed at 110 per cent. of par is also the head of another investment firm which recently sold the preferred stock of that corporation at 98 per cent. of par does not constitute such a personal interest as would taint the sale with fraud, notwithstanding the goodwill toward this manager's firm would be enhanced by such sale bringing to his customers a quick profit.

Though facts indicating a personal interest in the majority stockholders voting for the sale of the corporate assets are insufficient to vitiate the sale they may be properly considered in determining the fairness and adequacy of the terms of the sale.

The majority of the stockholders favoring a sale of the corporate assets owe to the minority more than the duty to merely refrain from appropriating the corporate assets to themselves, and must see to it that the assets are sold for a fair and adequate price such as will meet the statutory requirement that the terms and conditions of the sale shall be such as are expedient and for the best interest of the corporation.

Since there may be honest differences of opinion, the inadequacy of a price set upon the assets of a corporation will not suffice to condemn the transaction as fraudulent unless the inadequacy is so gross as to display itself as a badge of fraud.

In considering whether $73,000,000 plus for corporate assets appraised at $94,000,000 plus is such a grossly inadequate price as to indicate a fraud on the minority stockholders, it is improper to consider the matter in terms of common stock value per share, because the question involves solely the sale of the assets, and the fact that the common stock in one instance may have a value of but $15 but in the other instance its value would be $38, is of no consequence in determining whether a fair and adequate price had been received.

A private sale by heirs of a person owning the controlling interest in a corporation of all of the stock which they held at a price of $10 per share to a syndicate organized to resell it is not a reliable criterion of the fair value of the assets of the corporation, particularly where it appears that the corporation had just previously suffered losses, and the heirs desired their funds invested in more certain income-yielding securities.

The fact that a special inheritance tax appraiser of a sister State, attempting to determine the fair market value of stock in a closely held corporation, where there had been no previous sales, arrived at a value of $11, basing his determination on a private sale price plus a $1 dividend paid on the stock, is not a reliable criterion of the fair value of the assets of the corporation.

Where a syndicate refused to buy stock in a corporation unless it could secure control, and thereafter by purchase and voting trust agreement secured

control of 57 per cent. of the total stock, and participated in the election of directors, it will be presumed, in an action to enjoin the sale of all the corporate assets that the proposed sale was the act of the syndicate.

The fact that two of three managers of a syndicate organized for the purpose of buying and reselling at a profit a controlling interest in a particular corporation had speculative interests in the common stock of that corporation, and the fact that the third manager has a peculiar interest in the preferred stockholders of such corporation, may properly be considered in determining whether the directors of the corporation controlled by the syndicate have placed a fair and reasonable value on the corporate assets in a contemplated sale .

Personal reluctance should never restrain the issuance of injunction where facts are presented which justified it.

Where danger or threatened injury is such as cannot be easily remedied if an injunction is refused and there is no denial that the act charged is contemplated, a preliminary injunction should issue unless the defendant satisfactorily refutes the case made by the bill.

INJUNCTION BILL. Rule to show cause why preliminary injunction should not issue. Allied Chemical & Dye Corporation, the original complainant, and By-Products Coke Corporation, intervening complainant, are stockholders of the defendant, The Steel and Tube Company of America, a corporation of this State. The defendants are The Steel and Tube Company of America, its officers and directors, certain individuals composing the firm of Dillon, Read & Co., certain other individuals who are described as trustees, and The Youngstown Sheet and Tube Company, a corporation of the state of Ohio.

The Steel and Tube Company of America is the only defendant upon whom service has been had. It has duly appeared in the cause. All the other defendants are nonresidents, and no appearance has been entered for any of them.

The bill seeks to enjoin the sale of all the assets of The Steel and Tube Company of America to The Youngstown Sheet and Tube Company, as is contemplated under the terms of a contract between the two corporations dated January 6, 1923; and the preliminary injunction now asked for is to the same effect.

The history of The Steel and Tube Company of America is recited at some length in the bill. For the present purpose the details of this history need not be set forth. Only so much thereof will be stated as is necessary at this time.

The Steel and Tube Company of America was organized in 1918. The purpose of its organization was the consolidation into one enterprise of the three separate interests of its organizers, viz., of Semet-Solvay Company, of Ferdinand Schlesinger of Milwaukee, and his family, and of Clayton Mark of Chicago and certain members of his family. The properties of each of these three groups were put into the new corporation and stock issued to each upon the basis of agreed values for their respective properties. Upon completion of the organization, the capital stock of 250,000 shares (par $100 each) was issued to each group and the same was held in about the following proportions: Marks thirty-seven per cent., Schlesingers twenty-nine per cent. and Semet-Solvay Company twenty-nine per cent.

In 1919 the company embarked upon a program of expansion and in pursuance thereof not only undertook additional construction on a large scale, but as well acquired certain additional existing properties in which the Schlesingers and the Semet-Solvay Company had separate interests. This required additional financing and the assistance of William A. Read & Co. (now Dillon, Read & Co.), a firm of investment brokers in New York, was secured in such financing. The defendant Clarence Dillon was a member of the firm, and is now the head of its successor, Dillon, Read & Co.

The new financing required a reshaping of the capital structure of The Steel and Tube Company of America. Accordingly its certificate of incorporation was amended whereby its capital stock was changed from a par of $100 a share to $2 a share, and an issue of 175,000 shares (par of $100 each) of seven per cent. cumulative preferred stock was authorized. The preferred stock is callable at one hundred and ten per cent. of par, and is entitled to a like premium in case of liquidation of the corporate assets. It was marketed to the public by William A. Read & Co. at $98 per share, the company paying the brokers a commission of ten per cent. of par as compensation for their services. At the same time a portion of a total authorized issue of mortgage bonds was sold through the same William A. Read & Co. (Later the balance $10,000,000 of this issue was marketed by Dillon, Read & Co. at a price to net the company eighty-five and one-half per cent. of par).

In payment for the additional properties taken into The Steel

and Tube Company of America, the company issued its new common stock (par $2) to the persons entitled thereto and also issued in exchange for the old $100 par value stock its new stock on a basis of 2.266 shares for one. This arrangement was an exchange of new stock of a capital book value of $44 per share for the old stock, whose par was $100.

At the end of this financing the outstanding common stock was held as between the original interests about as follows: Schlesinger, fifty-seven per cent.; Marks, sixteen per cent.; and Semet-Solvay Company, sixteen per cent.; a total of eighty-nine per cent.

The Semet-Solvay Company's stock is now owned by the complainant Allied Chemical & Dye Corporation. It numbers 161,354¼ shares and cost an actual cash outlay of $6,577,742.20, or $41 per share. The total amount of common stock now outstanding is 967,330¼ shares. The intervening complainant owns 47,681 shares, or four per cent. of the common stock outstanding, making a total ownership by the complainants of about twenty per cent. of the entire common stock issued.

Ferdinand Schlesinger, who as appears from the above, owned the voting control of the common stock, died January 3, 1921. Before his death he had given portions of his common stock to members of his family. Upon his death, however, all of it was still in the hands of either his family or his estate. A block of it (136,771 shares) was transferred by his son, H. J. Schlesinger, to trustees, said trustees now being himself and the defendant Armin A. Schlesinger.

About April, 1922, negotiations were opened by the defendant Armin A. Schlesinger with the defendant Clarence Dillon for the sale of all of the so-called Schlesinger stock. Dillon referred Schlesinger to the defendant Harrison Williams. After making some investigation, Williams advised Dillon that, if he (Dillon) would form a syndicate for the purchase of the Schlesinger stock, he (Williams) and the companies in which he was interested would take a substantial participation therein. Accordingly Dillon formed such syndicate, his firm, together with Williams and Schlesinger, becoming its managers.

The syndicate purchased 406,590⅓ shares of the Schlesinger stock, the total thereof being 547,198 shares. The price paid was

$10 per share.  Of the total Schlesinger stock not sold to the syndicate, to-wit, 140,607⅔ shares, all was held by Armin A. Schlesinger either in his own name or under a trust.  He, however, obligated himself to place this stock in the hands of such voting trustees as the syndicate managers might name, and to permit the syndicate to dispose of it on like terms as the syndicate might dispose of its own stock, Schlesinger to receive from the proceeds, however, not less than $10 per share and his pro rata portion of any excess above that sum per share which the entire block might bring.  The syndicate agreement provides that it shall terminate in two years, to-wit, on May 1, 1924, but may be extended at the option of the managers with the written consent of all participants. The managers are to receive for their compensation a sum equivalent to ten per cent. of the total net profits of the operations of the syndicate.

After the syndicate thus secured a voting control of the majority of the common stock, a board of directors of the corporation, consisting of nineteen persons, was elected and the bill charges that eleven of these, by reason of their interest in the syndicate, or by reason of their close business, financial or personal, affiliations are controlled by Clarence Dillon, the organizer of the syndicate.  That they are so controlled is, however, denied by the appearing defendant.

After the syndicate was formed steps were taken to carry on certain negotiations for a merger of The Steel and Tube Company of America with certain other companies engaged in like or related businesses with it.  Three such attempted mergers having fallen through, negotiations were then entered into with the defendant The Youngstown Sheet & Tube Company to sell to it all the "property and assets, franchises and business of the Steel and Tube Company including its good will." Such negotiations culminated in a formal agreement embodying the terms of sale, dated January 6, 1923.  The consideration to be paid is an amount in cash equivalent to (a) $14,509,953.75 in cash; (b) $110 per share for each share of preferred stock outstanding in the hands of the public at the time of closing the transaction; and (c) an amount equal to dividends on preferred stock in the hands of the public down to the date of a distribution to preferred stockholders of

what would be due them on their stock. The purchaser is to assume all indebtedness of The Steel and Tube Company of America.

The directors of The Steel and Tube Company of America have approved the contract. Of the preferred stock, 132,058 shares out of 168,424 shares thereof outstanding, and of the common stock, 738,915 shares out of 967,330¼ shares thereof, have voted in favor of authorizing the completion of the contract. No prefered shares were voted against it. Of the common stock, only that held by the complainants, to-wit, 209,035¼ shares, voted in opposition.

As of November 30, 1922, the balance sheet of the company shows the assets after deducting depreciation, depletion and other reserves to have a book value of $94,337,426.11. The price to be paid is $73,077,739.67, this being the total of the items of cash payment, liabilities assumed and amount to be paid to the preferred stockholders.

The affidavit of John V. W. Reynders states that the total purchase price is equivalent to 77.4 per cent. of the total aggregate book value of the assets; that, leaving out of account the assumption of liabilities and regarding the transaction as a sale of the entire equity in the corporation represented by its preferred and common stocks, the purchase price is 60.8 per cent. of the book value of the net assets available for the preferred and common stock; and taking into account only the equity in the property belonging to the common stock, the purchase price represents 40.5 per cent. of the book value of the common stock.

The minority stockholders, complainant and intervening complainant, object that the sale is a fraud on them and accordingly pray that it may be enjoined. The bill also prays other special relief, but this needs no present consideration.

The cause was heard on bill and affidavits filed on behalf of the complainant and defendant, The Steel and Tube Company of America, at the return of a rule to show cause.

*William S. Hilles*, and with him, *Nathan L. Miller* and *Frederic Cunningham*, both of New York City, and *K. K. Knapp*, of Chicago, Illinois, for the complainants.

*Robert H. Richards*, and with him, *George W. Wickersham,*
*W. Lloyd Kitchel, Joseph P. Cotton* and *Boykin Wright*, all of New
York City, and *Charles F. Fawsett*, of Milwaukee, Wisconsin, for
the defendant, The Steel and Tube Company of America.

THE CHANCELLOR.    In *Butler v. New Keystone Copper Co.,*
*et al.*, 10 *Del. Ch.* 371, 93 *Atl.* 380, it was said:

"The general rule as to commercial corporations seems to be settled,
that neither the directors nor the stockholders of a prosperous, going
concern have power to sell all, or substantially all, the property of the
company if the holder of a single share dissent.    But if the business be
unprofitable, and the enterprise be hopeless, the holders of a majority of
the stock may, even against the dissent of the minority, sell all the property
of the company with a view to winding up the corporate affairs.    *Cook*
*on Corporations*, (*6th Ed.*) § 670; *Thompson on Corporations*, (*2d Ed.* §§ 2421,
2424.    See note in 35 *L. R. A.* (*N. S.*) 396, where many cases are collected."

The same rule is announced in *Geddes v. Anaconda Mining*
*Co.*, 254 *U. S.* 590, 41 *Sup. Ct.* 209, 65 *L. Ed.* 425, where the reason
for it is said to rest upon the principle that the exercise of a power
of sale of the assets of a going and prosperous company "would de-
feat the implied contract among the stockholders to pursue the
purpose for which it was chartered."    But elsewhere it is held
with some force of reason, that even though the company be
flourishing and prosperous, a majority of its stockholders may sell
all its assets and discontinue the business.    *Bowditch v. Jackson Co.*,
76 *N. H.* 351, 82 *Atl.* 1014, *L. R. A.* 1917A, 1174, *Ann. Cas.* 1913A,
366.

In the *Butler Case, supra*, the certificate of incorporation
contained a provision allowing the sale of all the corporate assets
with the assent in writing, or pursuant to vote, of three-fourths of
the capital stock of the company issued and outstanding.    The
Chancellor held that such a power might properly be taken by the
corporation under the general act under which it was incorporated;
and, such being so, it was competent for the corporation there con-
cerned to dispose of all its assets, the provisions of its certificate
regarding the assent of three-fourths of the stock outstanding be-
ing satisfied, and there being no allegation of mala fides, personal
advantage to the officers, or inadequacy of consideration.

At the time of this decision, the *General Corporation Law* of this State (*Rev. Code* 1915, §§ 1915-2101g) contained no provision touching the right of the corporation to sell all of its assets. At the next session of the Legislature, an act was passed (*Chapter 113, Volume* 29, *Laws of Delaware*) amending the *General Corporation Law*, which, among other things, provides a new section as follows:

"*Section* 64a. *Sale of Assets and Franchises.*—Every corporation organized under the provisions of this chapter, may at any meeting of its board of directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions as its board of directors deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of a majority of the holders of the voting stock issued and outstanding, provided, however, that the certificate of incorporation may require the vote or written consent of a larger proportion of the stockholders."

This provision remains in the law to-day and fixes in statutory form the rule imposed on all corporations organized under the general act by which they are to be governed whenever the question of the sale of their entire assets is under consideration.

The Steel and Tube Company of America was organized under the *General Corporation Law* of this State and is, therefore, subjuect to the provisions of the above *Section* 64a, which had been written into the law prior to its incorporation. Every stockholder who owns its stock holds it with the condition that at any time the corporate assets may all be sold when the provisions of the statute are complied with.

In reading this statute it will be observed that two things with respect to a sale are contemplated, viz., (a) an authorization of sale by the stockholders, and (b) a fixing of the terms and conditions by the directors. With respect to the latter, the directors must determine upon such terms and conditions as they "deem expedient and for the best interests of the corporation." Thus the right of the directors to define terms and conditions of sale is circumscribed by a discretion which must consult not only expediency, but as well the best interests of the corporation.

There is nothing in the section which countenances the idea

that whether or not a sale should be made is to be favorably determined only in case it is to the best interest of the corporation to make it. Though if made or authorized, the terms and conditions must conform to such interest. As I read the statute, therefore, the bald question of whether the entire assets should be sold is to be determined by the stockholders entirely aside from the question of whether it would be to the best interests of the corporation to sell them. It is doubtless generally true of any going, money-making corporation that it would be not to its best interests to sell all of its assets. Indeed, is not this the consideration underlying the old rule to which reference was made at the outset, viz., that the assets of a going, prosperous concern could not be sold except by the consent of all the stockholders? It was only where the concern was losing money, that is when its best interests suggested that the business be sold, that the majority had power to effect it.

If the right to sell can be exercised only when it is to the best interest of the corporation to do so, I can see no purpose in the enactment of the section above quoted.

In analyzing the statute, it would, therefore, appear that the right of the specified majority to sell all the assets is absolute insofar as the fact of sale and whether one should be made, is concerned. Upon the question of terms and conditions, however, the expediency thereof and whether they are for the best interests of the corporation must be honestly and in good faith considered. While it is the right of the majority to practically desert the corporate venture by selling out its assets, and thereby, in the case of a highly profitable concern, deprive their associates of the opportunity to reap gains in the future by continuing in business, yet this right cannot be exercised except upon terms and conditions that are fair to the corporation. The price to be paid, the manner of payment, the terms of credit, if any, and such like questions, must all meet the test of the corporation's best interest.

The majority thus have the power in their hands to impose their will upon the minority in a matter of very vital concern to them. That the source of this power is found in a statute, supplies no reason for clothing it with a superior sanctity, or vesting it with the attributes of tyranny. When the power is sought to

be used, therefore, it is competent for any one who conceives himself aggrieved thereby to invoke the processes of a court of equity for protection against its oppressive exercise. When examined by such a court, if it should appear that the power is used in such a way that it violates any of those fundamental principles which it is the special province of equity to assert and protect, its restraining processes will unhesitatingly issue.

To what head of equity jurisdiction may, then, the complaining stockholder appeal for protection against what he claims is an inequitable exercise of the power? The requirements of the statute and of the certificate of incorporation all being satisfied, as they are in this case, it will be manifest that the only ground upon which he can base his claim for relief is that of fraud. Notwithstanding that the right of the majority to sell all the assets is given by the statute, yet if the proposed sale is a fraud on the minority, it cannot stand.

Before examining the facts adduced by the complainants for the purpose of showing fraud, it will be in order first to define the relations which equity will regard as subsisting between the controlling majority members of the corporation and the minority. That under certain circumstances these relations are of a fiduciary character is clear. No one, of course, questions the fiduciary character of the relationship which the directors bear to the corporation. The same considerations of fundamental justice which impose a fiduciary character upon the relationship of the directors to the stockholders will also impose, in a proper case, a like character upon the relationship which the majority of the stockholders bear to the minority. When, in the conduct of the corporate business, a majority of the voting power in the corporation join hands in imposing its policy upon all, it is beyond all reason and contrary, it seems to me, to the plainest dictates of what is just and right, to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the directors in their relation to all the stockholders. Ordinarily the directors speak for and determine the policy of the corporation. When the majority of stockholders do this, they are, for the moment, the corporation. Unless the majority in such case are to be regarded as owing a duty to the

minority such as is owed by the directors to all, then the minority are in a situation that exposes them to the grossest frauds and subjects them to most outrageous wrongs.

I shall not undertake a review of the authorities which fully sustain these views. In the following cases, expressions of opinion may be found which amply sustain what has just been said: *Miner v. Belle Isle Ice Co.*, 93 *Mich.* 97, 53 *N. W.* 218, 17 *L. R. A.* 412; *Farmers' Loan & Trust Co. v. N. Y. & N. R. Co.*, 150 *N. Y.* 410, 430, 44 *N. E.* 1043, 34 *L. R. A.* 76, 55 *Am. St. Rep.* 689; *Kavanaugh v. Kavanaugh*, 226 *N. Y.* 185, 123 *N. E.* 148; *Wheeler v. Abilene Nat. Bank Bldg.*, 159 *Fed.* 391, 89 *C. C. A.* 477, 16 *L. R. A.* (*N. S.*) 892, 14 *Ann. Cas.* 917; *Hyams v. Calumet & Hecla Mining Co.*, 221 *Fed.* 529, 537, 137 *C. C. A.* 239; *Ervin v. Oregon Ry. & Nav. Co.*, (*C. C.*) 27 *Fed.* 625, 631; *Jones v. Missouri-Edison Electric Co.*, 144 *Fed.* 765, 75 *C. C. A.* 631.

Accordingly it has been held that if the majority stockholders so use their power as to advantage themselves at the expense of the minority, their conduct in that regard will be denounced as fraudulent and the minority may obtain appropriate relief therefrom upon application to a court of equity. But the general language by which this rule is stated is not to be given its widest possible application. For it is not true that every personal advantage which the majority secures is to be regarded as vitiating in character. An examination of the cases to which special attention is directed by the complainants in this connection will disclose that the personal advantage accruing to the majority is in some way derived from, or intimately associated with, the corporate assets themselves.

Thus in *Miner v. Belle Isle Ice Co.*, *supra.* where the acts complained of were done by the president of the corporation, who was also its manager and in control of the majority of its stock, the fraud consisted in an absorption by the dominant member of all the returns on the corporate investment. In *Wheeler v. Abilene Nat. Bank Bldg.*, *supra*, the holder of a majority of the capital stock voted it at a stockholders' meeting to confirm the sale of corporate property to himself. In *Theis v. Spokane Falls Gaslight Co., et al.*, 34 *Wash.* 23, 74 *Pac.* 1004, a syndicate in control of the majority stock, in order to "freeze out" a minority holder, was

using its power to sell the assets and dissolve the corporation. The proposed sale of all the assets was to a corporation organized by the members of the syndicate and was in reality a sale to themselves. So in *Hyams v. Calumet & Hecla Mining Co., supra*, the defendant is said (221 *Fed. at page 542, 137 C. C. A.* 239) to have been both buyer and seller. In *Ervin v. Oregon Ry. & Nav. Co., supra*, the same situation appears, where the majority which favored the sale was at the same time the purchaser. In *Jones v. Missouri-Edison Electric Co., supra.*, the scheme there complained against involved a sale procured by the majority to themselves.

After examining all the authorities cited on the briefs of both sides, I find that, wherever the question of whether the fiduciary character which the law attaches to the majority in matters of the kind now before me is considered and the charge made that its quasi trust obligations are ignored, the personal advantage which the alleged wrongdoers attempt to gather to themselves is in some way directly incident to the very property towards which they stand in the fiduciary relationship and which they seek to appropriate either in whole or in part to themselves, to the exclusion and injury of those whom they have at their mercy.

The case of *Kavanaugh v. Kavanaugh Knitting Co.*, 226 *N. Y.* 185, 123 *N. E.* 148, upon which the complainants so strongly rely, when carefully read, insofar as the point now under consideration is concerned, is not distinguishable from the cases just referred to. For at page 197 of 226 *N. Y.* (123 *N. E.* 152) the following language appears:

"Obviously, facts are alleged [the case was on demurrer] which permit, if they do not compel, the inference that the directors conceived and progressed the scheme of dissolving the corporation, irrespective of the welfare or advantage of the corporation and of any cause or reason related to its condition or future, through the desire and determination to take from the corporation and to secure to themselves the corporate business freed from interference or participation on the part of the plaintiff."

In the instant case there is no pretense that the personal advantage which the majority may derive from the sale consists in any wise in securing to themselves either the whole or any part of the corporate assets. So far as appears, they and the purchasers

are complete strangers in interest. The complaintants, however, contend that, though there is nothing in common between the interests of the purchaser and the majority favoring the sale, there is, nevertheless, such a personal advantage to be derived from the sale by the majority as in equity will vitiate the whole transaction. Before proceeding to examine the nature and character of this personal interest, it may be well to pause for a moment to differentiate between the situation presented by this case and that presented by the *Kavanaugh Case* above referred to, and upon which the complainants, as stated, so strongly rely.

In this case it is again to be noted that as to whether a sale should be made is a question which under the terms of the statute is to be decided by the prescribed vote of the stockholders, and in deciding the question the stockholders are not required to be governed by the further question of whether from the view point of the corporation's best interests its assets ought to be sold. In this regard the statute is somewhat similar to the act of Congress (*Rev. St.* § 5220 [*Comp. St.* § 9806]) conferring upon national banks the right to "go into liquidation, and be closed, by the vote of its shareholders owning two-thirds of its stock." Two cases, viz., *Watkins v. National Bank of Lawrence, et al.*, 51 *Kan.* 254, 32 *Pac.* 914, and *Green, et al., v. Bennett, et al.*, (*Tex. Civ. App.*) 110 *S. W.* 108, in considering this Federal statute hold, that the power of the two-thirds to liquidate is in no wise circumscribed by the implied limitation that it may be exercised only when the interest of all the stockholders, including the minority, may be best subserved thereby. A statute may, however, contain language which while conferring a power, for instance to dissolve a corporation, nevertheless restricts the right to use it only in case the best interests of the corporation and all its stockholders would be subserved thereby. Such appears to have been the situation in the *Kavanaugh Case, supra*, which on this ground, as well as the one before noted, is distinguishable from the instant one. For the same reason also *Barrett v. Bloomfield Savings Institution*, 64 *N. J. Eq.* 425, 54 *Atl.* 543, cited by the complainants, is distinguishable from this case. In both these cases, the dissolution could take place under the statute only when the managers or directors resolved that such a course was "advisable." The presence of this word in the

statute might very properly justify a review by the court of the advisability of the proposed dissolution from the view point of the entire membership. The right to sell under the Delaware statute, however, is not restrained in its enjoyment by any question of advisability. Only terms and conditions are required to square themselves with advisability or the best interests of the corporation.

I return now to a consideration of the nature of the alleged personal interest of the majority which the complainants rely upon as vitiating the proposed transaction of sale. This consists, according to the allegations of the bill in (a) the special interests of the syndicate in effecting a quick liquidation of its common stock holdings; (b) the special interests of Clarence Dillon and his partners in the firm of Dillon, Read & Co. to protect and enhance their goodwill by securing an opportunity to holders of the preferred stock to receive therefor $110 per share, the same having been sold to them by the firm's immediate predecessor for $98 per share; and (c) the special interest of the syndicate, and of the defendants Clarence Dillon and his firm to liquidate their own holdings of preferred stock at the redemption price of $110 per share.

It is manifest that if all these interests are subserved by the sale it will not be at the expense of the equal and pro rata interest of the complainants in the assets of the corporation. As to the preferred stock and its claim of $110 a share upon the assets in preference to the common stock, such a situation is not of recent creation. It is due entirely to the capital structure of The Steel and Tube Company of America, which the complainants or their predecessors in title assisted in creating. Whether a sale should be made and, if so, whether the terms are fair, can in no wise be determined with respect to the fact that upon dissolution the preferred stock will receive what the articles of incorporation assure to it. But, it is earnesly contended that if those who are in control of the corporation and in position to dominate its policies are themselves the holders of preferred stock and as such will be benefited in a distribution which will in all likelihood follow, then their interest as preferred stockholders forbids that they should be permitted to exercise their power as common stockholders to bring about the sale. And the same sort of argument is advanced

against the right of the majority to use its voting power in favor of a sale, when that majority has purchased common stock at $10 per share, which stock, after the sale and in event of subsequent distribution, will receive $15 a share, thus yielding to its purchasers a profit of $5 per share. I am unable to accept this argument. In its last analysis it requires an examination into the individual and personal motives which actuate stockholders in their corporate voting. It invites a consideration of questions concerning each stockholder and his vote with which his co-stockholders are in no wise concerned, so long as the consequences of the corporate action are visited in equal and impartial measure upon all alike. If such were not so, a highly impracticable rule would be introduced into all corporate affairs. It seems to me out of all reason to hold that a stockholder who has paid less for his stock than another should for that reason be denied a voice upon a question of sale simply because in the event of liquidation, he will, while receiving the same identical amount on distribution as his higher cost fellow stockholder, nevertheless make more on his investment. In that case, the unfortunate person is the one who sold his stock to the low cost man for less than it turns out to be worth. I cannot see how any one else should be concerned about it.

Furthermore, suppose the sale to yield a sum on each share excessively beyond its value and above the cost price to any stockholder, would the fact that stock bought at a low price was about to afford to its owner a larger profit than would be afforded to others who had bought at a higher price, serve to deprive the former of a right to be counted in advocacy of the sale? The right of stockholders to participate in the business of the corporation cannot be controlled by such considerations as these. Courts have gone far in refusing to allow personal considerations to negative the stockholder's right to vote his stock from whatever motive he may choose. *Pender v. Lushington, L. R. 6 Ch. Div.* 70; *N. W. Transportation Co. v. Beatty, L. R. 12 App. Cas.* 589; *Windmuller v. Standard Distilling & Distributing Co., (C. C.)* 114 *Fed.* 491; *U. S. Steel Corp., v. Hodge,* 64 *N. J. Eq.* 813, 54 *Atl.* 1, 60 *L. R. A.* 742; *Shaw v. Davis,* 78 *Md.* 308, 28 *Atl.* 619, 23 *L. R. A.* 294. For the same reason that the prospect of having the preferred stock redeemed at 110 per cent. of par, or of making a profit of $5 a share on

the purchase of common stock, does not constitute such a personal interest as will taint with fraud the action of the majority common stockholders who will thus be benefited by favoring the sale, the fact that the firm of which Clarence Dillon is the head might incidentally reap the advantage of an enhancement of its goodwill before the public, cannot be said to constitute such a personal advantage as will vitiate the sale which Dillon as one of the members of the controlling syndicate favors. Aside from all other considerations, there is no showing that Dillon, however great his influence with his two associate syndicate managers may be, has been able to so dominate them in voting the syndicate stock as to indicat that he alone controls it. He is a minority in the syndicate, and hence not in a position to control.

My conclusion with respect to this branch of the case is, that the evidence before me fails to disclose such a peculiar and personal interest or advantage to be served by the sale as will, on the principles applicable to the conduct of one who acts in a fiduciary capacity, taint the proposed transaction with fraud, either actual or constructive. Whatever advantage is gained is purely incidental and collateral. This prospect of personal gain, though not thus to be condemned as fraudulent in character, may however be very properly regarded when, as will subsequently appear, the fairness and adequacy of the terms of sale are considered in connection with the present application.

The majority who are favoring the sale owe something more to the minority than to merely refrain from appropriating, either directly or indirectly, the corporate assets unto themselves. They owe the further duty of seeing to it that the assets shall be sold for a fair and adequate price. Any other kind of price would fail to meet the requirement of the statute that the terms and conditions of the sale should be such as are expedient and for the best interest of the corporation. Indeed, even if the statute contained no such requirement, equity would impose it. For if a trustee who has the right to sell the assets of his *cestui que trust* undertakes to do so, the duty is exacted of him that he demand and secure an adequate price. Even though the sale is of no affirmative advantage or profit to himself, yet, taking the negative aspect of the matter, if it injures the beneficiary by letting his equitable assets go for an

unfair and inadequate price, the act of the trustee in making the sale will in equity be condemned as wrongful. I take it that authority need not be cited in support of this proposition. One instructive case may, however, be referred to. In *Jackson v. Ludeling*, 21 *Wall.* 616, 22 *L. Ed.* 492, one holder of four of the bonds of a corporate issue had power under the local law to sell on executory process the property which was pledged as security for all. While he had the right under the law thus to effect a sale of the entire security, yet his purchase of the bonds had placed upon him duties of a fiduciary nature towards his co-bondholders, and if he exercised his legal right to force a sale, it was said by Justice Strong, speaking for the court, that he had no right either to destroy its value or to impair its worth to the others.

This is the reason which underlies the rule, applicable here, that if the majority sell the assets they are required to obtain a fair and adquate price therefor and thus save from loss the minority who are helpless.

When the question is asked whether in a given case the price is adequate, it is readily seen that room is afforded for honest differences of opinion. While the parties to the controversy may be guilty of an intolerance of view towards each other, yet a court, when called upon to decide the question, must endeavor, as best it may, to arrive at the correct answer, making all due allowance for the range over which honestly inclined minds may wander. It is further true that inadequacy of price will not suffice to condemn the transaction as fradulent, unless the inadequacy is so gross as to display itself as a badge of fraud. I take it that so long as the inadequacy of price may reasonably be referred to an honest exercise of sound judgment, it cannot be denominated as fraudulent. When the price proposed to be accepted is so far below what is found to be a fair one that it can be explained only on the theory of fraud, or a reckless indifference to the rights of others interested, it would seem that it should not be allowed to stand.

I come now to an examination of the question of the adequacy of the price proposed to be received for the assets of this corporation. As appears from the statement of facts, the sale price is $73,077,739.67. The book value of the assets is $94,337,426.11. The book value is based on a recent appraisement made in 1922,

some time in the latter part of the year.   The values given by the appraising engineers, as appears from the affidavit of Mr. Reynders, were intended to present what he calls "sound values."   By that phrase he states that he means "the estimated present cost of replacement less depreciation based upon age and condition." This appraisement was made in the course of the negotiations on foot in 1922 looking to a merger of certain independent steel companies, including The Steel and Tube Company of America.   It was not designed to show the market value of the assets.

The complainants contend that this so-called book or sound value truly represents the fair market value of the assets, and they point out that the assets appearing on the balance sheet should be further increased above the total figure given because no credit is therein allowed for the goodwill of the business as a going concern, which is contracted to be sold.   What this would amount to, they do not show.   But that it is an asset of some considerable value, they insist upon as true, and particularly so because the company's business is now in a prosperous condition, it having earned in January, 1923, the sum of $921,458.25, and a net for the common stock after all deductions, including $250,000 for depreciation and $98,247.33 for preferred dividends, of $383,757.23.

On the other hand, the defendant insists that the book or sound value as shown by the appraisement is not a measure of the fair price to be obtained on a sale.   Such a price, they insist, is the sum bargained for, notwithstanding it is $21,000,000 less than the book or sound value plus whatever the goodwill is worth, if anything.

And so between these wide extremes I am invited to make a choice.   I confess I am unable, on the present showing, to do so with any satisfying degree of confidence in my judgment.   I am now considering solely the discrepancy in value so far as the assets are concerned.   This, measured in money, is $21,000,000 plus.   From the viewpoint of the equity of the common stockholders in the property, it is the difference between $38 a share and $15 a share.   But I do not regard it as proper to think of the matter in terms of common stock value per share,  because the question before me involves solely the sale of the assets and the securing therefor of a fair and adequate price.   How such a price may work

out for the common stock in event of liquidation is, I conceive, of no consequence.

That the proposed sale of the assets for a price which will yield the common stock a per share liquidation sum of $15, as this sale will, indicates that the assets are being sold for an adequate price, is insisted upon by the defendant because, as appears from the evidence, the State of Wisconsin in assessing the common stock for inheritance tax purposes after the death of Ferdinand Schlesinger placed upon the stock a value of only $11 per share. But I am not persuaded that I can rely upon this fact as an indication of present asset values. The State of Wisconsin assessed the stock as of January, 1921, and what it sought to ascertain was the fair market value of the stock. Being a stock which was closely held and of which no sales whatever had ever been made from which fair market value could be judged, considerable testimony was taken in the Wisconsin tax proceedings to ascertain the market value of the corporation's assets from which, by a process of reasoning reverse to that which the defendant seeks here to employ, it was hoped to arrive at a figure for the fair market value of the stock. Before those proceedings were completed the Schlesinger stock was sold to the Dillon syndicate at $10 a share, and this sale was accepted by the special appraiser as the controlling element in fixing a value for the stock. He accordingly took that figure and added $1 thereto because the company had paid a dividend of that amount on each share of common stock before the sale to the syndicate. In this manner $11 a share was the value placed by the Wisconsin special appraiser upon the common stock. This is convincing evidence, the defendant insists, that a price which will yield $15 a share to the common stock is a fair one. The trouble I find with this argument is, that it starts with an unsound premise, viz., that the sale of stock at $10 a share is a reliable indication of the market value of the assets.

In *Ervin v. Oregon Ry. & Nav. Co.*, (C. C.) 27 *Fed.* 625, 634, in speaking of the value of a corporation's assets, the court said:

"The market price of its shares on the stock exchange is not a reliable criterion of the true value of its property."

The more so is the private sale price of $10 a share an unreliable criterion of the fair value of the assets in this case, when re-

gard is had to the circumstances surrounding the sale. Armin A. Schlesinger, who negotiated the sale to the syndicate, stated to Harrison Williams that he did not want so large a share of the wealth of his family, his mother and sister being among them, tied up in speculative investments such as the Steel and Tube Company's common stock; that the Steel and Tube Company had suffered heavy losses during the year 1921; and that his family desired their funds invested in some more certain income yielding securities. This being the motive for the sale, it is manifest that the price which the Schlesingers were willing to take for their stock cannot be a reliable index of the value of the corporate assets, however much of a controlling consideration it might have been with the Wisconsin special tax appraiser, who was interested solely in the question of the fair market value of the stock.

It does not, therefore, seem to me that I would be justified at this stage of the case in accepting the Wisconsin assessment of $11 a share as a safe criterion of the value of the corporate assets. In saying this, I am not unmindful of the statement appearing in one of the affidavits that one, at least, of the general appraisers was governed in his views by considerations other than the sale price of the Schlesinger stock. The fact is, that this price was, as before stated, the controlling element in the matter.

Here, therefore, is a situation where it is proposed to sell corporate assets for $21,000,000 less than the corporation has been carrying them at. A recent appraisal shows that the amount at which they have been thus carried represents a sound value. It may readily be conceded that this sound value, or book value, may, however, be in excess of fair market value. On final hearing, after due consideration is given to the value, if any, of goodwill, of earning power and to the fact that the assets are of a going concern and not being disposed of under a forced sale, it may be true that the view may be honestly entertained that at a fair price the assets would bring no more than the sum named in the contract. I have difficulty, however, in reaching such a conclusion on the present showing.

I now mention a feature of the case that contributes quite materially to that difficulty. The syndicate is in control of this corporation. It owns fifty-seven per cent. of the common stock. It

would not consider the proposition of buying into the corporation, unless it could secure a controlling interest. It got such an interest. I shall not reflect upon the gentlemen whom it elected as directors by characterizing them as mere tools to work the syndicate's will. At the same time, I shall not assume that capable and shrewd business men would deliberately purchase only on condition that their purchase would yield the control, and then, having secured the control, be so neglectful of their purposes as not to make sure of their realization. Until something more convincing appears, common sense demands that the proposed sale be regarded as the act of the syndicate.

Now what was the purpose of the syndicate? The affidavits of Harrison Williams, its chief participant, at whose suggestion it was formed, and of Clarence Dillon, its organizer, are to the effect that the purpose and only purpose was to make a profit on the purchase of the Schlesinger stock. If to make this profit it appeared advisable to put money into the plant and continue operations, that would be done; or if it appeared advisable to sell the stock, that would be done; or, if it appeared advisable to sell out the business, that would be done. "My purpose," says Mr. Williams, "was to follow whichever of these two (three) courses appeared to offer the greatest profit to the syndicate."

The syndicate managers are Dillon's firm, Williams and Armin A. Schlesinger. Williams, of course, is interested in its profits as a participant. So also is Schlesinger, because of the arrangement made with him for the disposition of his own stock along with the syndicate holding. Dillon is likewise interested to the extent of his share in the percentage of profits to be paid to the managers as compensation for their services. He has a further interest peculiar to himself which I think may fairly be taken into account as prompting him to join with his co-managers in promoting the sale in question. I refer to the fact that holders of preferred stock who bought the same upon the advice and recommendation of his firm will receive, in case of liquidation, a comfortable premium upon their purchase.

Now, while none of these things, either alone or in combination, will as I have heretofore said, suffice to show such a personal interest as will raise a presumption of fraud, yet when the question

of the fairness of price to the minority is under consideration they may be fairly taken into account, at least in disposing of the application for a preliminary injunction.   These things will in no wise, in event of liquidation, give to the persons named any disproportionate advantage at the expense of the minority out of the assets of the corporation.   But they are of such a nature as very reasonably suggests that in approaching the determination of the question of adequacy of price they might cause the interested persons to view the question not so much from the angle of stockholders interested primarily in securing the best possible price for assets, but from the angle of purchasers of stock interested primarily in securing a fair profit on a speculation.   It is difficult to escape from the thought that the prospect of making about $2,000,-000 within a year upon a layout of $1,500,000 with interest, is such an alluring one that those who are temped by it are very apt to pass upon the interests of others who happen to be concerned in the transaction with less regard for their welfare than otherwise would be the case.

And so while I refuse now to say that the sound value of $94,000,000 is also the fair market value, or that the proposed sale price of about $73,000,000 is not an adequate one, yet I am convinced that the discrepancy between the two is so great, especially when viewed in the light of the speculative interests in the common stock which two of the syndicate managers have and the peculiar interest in the preferred stockholders which the third syndicate manager has, that a fuller investigation into this matter of fair value should be had.

If the preliminary injunction is denied, the minority stockholders will be barred of all relief, upon proof which is not only not conclusive against them, but is of a character sufficiently strong to permit them at least to have an opportunity to sustain their contentions.   To deny the injunction would, I take it, finally dispose of their case, no matter how meritorious it may appear to be on final hearing.   As much as I am loath to issue the powerful process of injunction, yet where facts are presented which justify it, no personal reluctance of the Chancellor should restrain him. It is needless, of course, to say that the issuance of the preliminary injunction against the sale determines nothing finally.   All that

I am intending to now decide is that a case is presented which calls for fuller investigation; and that the subject-matter of the suit should remain in *statu quo* pending such investigation.

In *U. S. v. Duluth,* 1 *Dill.* 469, 25 *Fed. Cas.* 923, *No.* **15001,** Mr. Justice Miller said:

"The affidavits on both sides are numerous. They demonstrate what all courts and juries have so often felt, that where the question is one of opinion and not of fact, though that opinion should be founded on scientific principles or professional skill, the inquiry is painfully unsatisfactory, and the answers strangely contradictory.

"In this emergency I am relieved by a principle which has generally governed me, and which, I believe, governs nearly all judges, in applications for preliminary injunctions. It is that, where the danger or injury threatened is of a character which cannot be easily remedied if the injunction is refused, and there is no denial that the act charged is contemplated, the temproary injunction should be granted, unless the case made by the bill is satisfactorily refuted by the defendant."

This principle, so clearly announced by Justice Miller, is applicable here. If the injunction is now denied, the threatened injury, if it eventually is proved to be such, cannot be remedied. Certainly it cannot be remedied in this court, for the proposed purchaser, though a defendant, has not appeared and is beyond the court's jurisdiction.

In ordering the injunction, I am not unmindful of the possible injury that may be done the majority stockholders. The parties may, therefore, be heard upon the question of the amount of bond to be required. It appears that the contract of sale by its terms contemplates that the transaction may not be closed before July 2, next. I see no reason why a full hearing may not be had on the question of price and the matter finally disposed of before that date. If so, and it should be ascertained that the price is fair or not so inadequate as to justify the inference of fraud, then the defendant will have time to close the transaction within the outside limit named in the contract.

The preliminary injunction restraining the sale will issue as prayed, upon the complainants giving bond in an amount to be fixed after hearing the parties.

NOTE: For report of opinion on motion to dissolve preliminary injunction, see *post p.* 64; opinion on renewal of motion for preliminary injunction, see *post p.* 117; and opinion on motion by complainants to dismiss the bill of complaint, see *post p.* 368.