**Libby G. LYNCH, Plaintiff,**

**v.**

**VICKERS ENERGY CORPORATION et al.,
Defendants.**

Court of Chancery of Delaware,
New Castle.

Jan. 22, 1976.

Irving Morris of Morris & Rosenthal, Wilmington, and Sidney B. Silverman, Joan T. Harnes, and Martin H. Olesh of Silverman & Harnes, New York City, for plaintiff.

Louis J. Finger of Richards, Layton & Finger, Wilmington, and Robert L. Stern, Leo Herzel, George W. Hamman, and Susan Getzendanner of Mayer, Brown & Platt, Chicago, Ill., for defendants Vickers Energy Corp., Esmark Inc., Richard J.

Boushka, Donald P. Kelly, Robert D. Phillips and Jack A. Vickers.

David A. Drexler of Morris, Nichols, Arsht & Tunnell, Wilmington, and William Key Wilde of Bracewell & Patterson, Houston, Tex., for defendants Stormy F. Smith, William A. Alexander and Edward J. Hudson.

MARVEL, Vice Chancellor.

On October 11, 1974, plaintiff, in response to a September 30, 1974 offer of the defendant Vickers Energy Corporation to purchase any and all of the outstanding shares of common stock of its subsidiary, TransOcean Oil, Inc., tendered to the would-be buyer her one hundred shares of common stock of such corporation. At the time such offer was made Vickers was the holder of 53.5% of the issued and outstanding shares of common stock of TransOcean, Vickers being in turn a wholly-owned subsidiary of Esmark, Inc., the board of which, headed by Donald Kelly, its president, had earlier in 1974 decided on a course of action designed to acquire for Vickers as many of the outstanding minority shares of common stock of TransOcean as possible.

Plaintiff now seeks relief for the damages allegedly suffered by her and others of her class as a result of the sale of their TransOcean stock to Vickers, complaining that the individual defendant directors of TransOcean, who were allegedly under the control of their corporation's majority stockholder, the defendant Vickers, and who made no recommendation as to acceptance or rejection of the offer in issue, breached their fiduciary duty to plaintiff and other minority stockholders of her class who tendered their shares by not actively opposing the Vickers' offer, an offer which plaintiff claims to have been made for a grossly inadequate consideration, namely $12 [1] per share, an offering price

1. In the summer of 1974 TransOcean common stock traded at a low of $6¾ per share in the over-the-counter market. On September

24, 1974, however, two days before publication of the offer in issue, the price of TransOcean rose from $6⅞ to $9⅞. Its high

suggested by Goldman, Sachs & Company, whose services as dealer manager of the offer had been engaged by Esmark, representing a premium of from $4 to $5 per share over the market price for such stock prior to September 24, 1974. In response to such offer, the holders of 4,460 of the 7,250 minority stockholders of TransOcean chose not to tender their shares. However, as a result of the Vickers' offer the latter became the holder of approximately 87% of TransOcean common stock.

TransOcean has, until the recent past, been engaged directly and through subsidiaries almost exclusively in the business of offshore exploration followed by exploitation of discovered profitable sources of petroleum and natural gas for the most part in the Gulf of Mexico. However, such corporation has a substantial interest in petroleum and gas drilling rights in the North Sea off Great Britain and has recently also devoted some of its drilling activities to areas [2] within the land boundaries of the continental United States and Canada.

At the inception of this litigation this Court declined to restrain the carrying out of the September 30, 1974 offer here in issue, and this is the opinion of the Court after final hearing.

Plaintiff's complaint charges that the offer in issue was not only made for a grossly inadequate price based on a fraudulent concealment of the actual value of shares of common stock of TransOcean but in addition contained statements which tended to compel selling in response to the offer in that the circular, which contained such

offer to purchase all tendered shares of stock held by the minority stockholders of TransOcean, stated that in the event that a substantial number of such stockholders of such corporation were to tender their shares, the result could be an inactive market [3] for such corporation's remaining shareholders and that if fewer than three hundred such stockholders should remain after the completion of the Vickers offer, then such stock would be deregistered, as permitted by the Securities Act of 1934, and that in the event of deregistration, TransOcean would not be required to issue financial reports or proxy solicitation material to its shareholders. Finally, it was reported to the minority stockholders that in the event of deregistration that the officers and directors of TransOcean would not be subject to the proxy rules of § 14 or the short-swing profit provisions of § 16(c) of the Securities Act of 1934, *Sonesta International Hotels Corporation v. Willington Associates* (C.A.2) 483 F.2d 247 (1973). Plaintiff concedes that federal law requires that such disclosures must be made in an offer for tenders of stock but contends that in purportedly making required disclosures only half-truths were in fact revealed. As matters transpired, however, a more than substantial number of holders of stock of TransOcean, including several of its own directors, declined to sell their shares, and an available market for TransOcean shares continued to exist after expiration of the extended period for the purchase of tendered shares pursuant to the September 30, 1974 offer.

Thus, plaintiff in effect argues that caught in mid-stream between two unat-

---

for 1974, achieved in the first quarter, was a bid of $15 per share, and its all time high, achieved in the second quarter of 1971, was a bid of $30⅝ per share. TransOcean has never paid a dividend and does not expect to in the foreseeable future. The September 30, 1974 offer fixed TransOcean's net asset value per share at approximately $16.00.

2. "Although most of the Company's onshore exploration activities are at present in the

initial stages, the management of the Company believes that its onshore activities involve the potential of discovering significant reserves." Offer to Purchase, September 30, 1974, pl. ex. # 3.

3. TransOcean's common stock has been and still is traded on the over-the-counter market and is quoted by the National Association of Securities Dealers, Inc. through its automatic quotation system.

tractive alternatives, she did not have a free and meaningful choice of a course of action to take compatible with the advancement of her own best interests in response to the offer here in issue and was thereby coerced along with other members of her class into electing to embrace one of two alternatives, neither of which she claims served properly to protect her equity in her common stock of TransOcean and that of her similarly situated fellow stockholders.

Plaintiff accordingly contends that by reason of the unopposed over-reaching by the directors and officers of Esmark and of Vickers, the holder, as noted above, of a majority of the shares of common stock of TransOcean, all of the shares of which in turn are held by a third dominant corporation, namely Esmark, that she and others of her class are entitled to an award of damages in an amount equivalent to the difference between the stipulated offering price contained in the Vickers September 30, 1974 offer for tenders of TransOcean stock and the fair or intrinsic value of the TransOcean stock tendered in response to such offer, a form of relief, which, if granted, would be comparable to that afforded an objecting stockholder entitled to an appraisal of the intrinsic value of his shares of stock after a corporate merger.

Turning again to the offer for tenders here in issue, it is plaintiff's contention that in late September, 1974, at a time when the market price of TransOcean stock was abnormally depressed due to general unhealthy economic conditions, the defendant Vickers, by means of its control of the voting stock of TransOcean, seized the opportunity thereby presented to force the minority stockholders of such corporation into making what can be informally termed Hobson's choice, namely a choice without a reasonable alternative. And it is the damages allegedly suffered by plaintiff and those members of her class of stockholders who tendered their shares (and who have not elected to be excluded from this action) as a result of their al-

leged forced acceptance of the offering price of $12 per share which are sought in this action after trial.

■ First of all, there is no doubt but that in situations in which the holder of a majority of the voting shares of a corporation, as here, seeks to impose its will upon minority stockholders, the conduct of such majority must be tested by those same standards of fiduciary duty which directors must observe in their relations with all their stockholders, *Allied Chemical & Dye Corporation v. Steel & Tube Co.,* 14 Del.Ch. 1, 120 A. 486 (1923), and *Epstein v. Celotex Corporation,* Del.Ch., 238 A.2d 843 (1968). I take this to mean that in a situation such as the one found in the case at bar that the majority stockholder here, namely Vickers, had a duty to exercise complete candor in its approach to the minority stockholders of TransOcean for a tender of their shares, namely a duty to make a full disclosure of all of the facts and circumstances surrounding the offer for tenders, including the consequence of acceptance and that of refusal, and insofar as the price offered is concerned that it not be one which would induce the acceptance of an unconscionable bid by an unwary stockholder at a price below the market or otherwise unreasonable under the facts and circumstances attending such offer for tenders of stock. Accordingly, the disclosures made in connection with the September 30, 1974 offer of Vickers must be considered in the light of such principle.

The September 30, 1974 offer of Vickers Energy Corporation contained the following in heavy print with the words "not less than" underlined.

"Management of the Company has informed the Offeror that, based on a calculation of discounted present value of the Company's reserves and values attributable by the Company's management to the Company's undeveloped acreage and other assets, management of the Company estimates that at this date the

Company's net asset value adjusted for such factors is not less than $200,000,000 (approximately $16.00 per share) and could be substantially greater. While the foregoing evaluation is based on the current judgment of the management of the Company, it should be recognized that because of the highly uncertain conditions affecting oil and gas values and because of the many assumptions it was necessary for the management of the Company to make in its evaluation, the evaluation is necessarily arbitrary and there can be no assurance that the values ultimately realized from such assets will be consistent with the estimate of the management of the Company. See Reserves, Valuation of Assets and Earnings."

Later in the offering letter under the heading of "valuation of Assets", similar language is used, the phrase "not less than" again being underlined.

"The Company's management estimates that as of this date the aggregate net discounted value of the Company's proved developed, proved undeveloped, probable and possible reserves, its undeveloped acreage and its other assets is not less than $200,000,000 (approximately $16.00 per share) and could be substantially greater. In making its evaluation of assets, management made many assumptions, including, among other things, various assumptions relating to production costs, increasing oil and gas price levels, taxes, depletion allowances, government regulations and controls, intangible drilling costs and investment tax credits, and utilized an appropriate discount factor. While management believes that such assumptions are reasonable in light of current circumstances, there is no assurance that these assumptions will prove correct."

The September 30, 1974 offer also stated under the title "Purpose of Transaction."

"The Offeror's purpose is to acquire as many of the shares of Stock of the Company as possible hereby. Offeror wishes to increase its ownership of the Company's Stock because it believes that the Company's stock has a value higher than the recent market prices for such shares and represents an attractive long-term investment at the present time."

Notwithstanding such disclosures of the facts and circumstances surrounding the offer, plaintiff argues that there were several basic areas of claimed non-disclosure of critical facts in the Vickers offer, namely that its offering circular did not disclose that an estimate of the discounted present value of TransOcean's reserves, undeveloped acreage and other assets had been fixed by one Forrest Harrell, a highly qualified petroleum geologist and a member of TransOcean's management, in the amount of $250,800,000, and that the management of Vickers had authorized open market purchases of TransOcean common stock during a period preceding the September 30, 1974 offer for bids of up to $15 per share. Plaintiff also claims that there was a failure to make it clear to the stockholders of TransOcean that such corporation's recent on-shore drilling activities might prove to be as significant as its offshore drilling had been. Finally, plaintiff contends that the September 30, 1974 offer failed to disclose the importance of the position of TransOcean in drilling activities in the North Sea between Great Britain and Scandinavia.

■ First of all I am satisfied that the so-called Harrell report assumed the recovery of 100% of TransOcean's proven and probable reserves and a recovery of 75% to 50% of possible reserves. Each of these estimates should, in my opinion, be substantially discounted in light of the uncertainties inherent in the business of drilling for petroleum and natural gas. Furthermore, Mr. Harrell added $15,000,000 to his estimate based on the unlikely expectation that the Federal Power Commission will approve the sale by TransOcean to a

Swift Chemical Company plant of natural gas at double the controlled rate. And while Mr. Harrell had also suggested a possible asset figure for TransOcean of $300,000,000, I conclude that, in a field as uncertain as one involving the exploration of known and suspected resources of natural gas and petroleum, that the ". . . not less than $200,000,000 . . ." phrase used in the offering circular qualified by the phrase . . . "and could be substantially greater . . ." furnished the TransOcean stockholders with adequate facts on which to make an educated choice, a conclusion which finds support in the later report of Butler, Miller & Lents.

█ Insofar as the open market purchases authorized by the board of Esmark in the summer of 1974 are concerned, the record is clear that the $15 limit set for such purchases of TransOcean stock was just that, namely a ceiling on board authorization of such purchases so that new resolutions would not have to be sought from time to time if required to meet the market price of TransOcean. In point of fact an average price of $11.49 per share was paid for such open market purchases prior to their discontinuance on advice of counsel, a fact which was disclosed in the offering circular, those responsible for such offering being of the view that to have referred to the $15 ceiling in the September 30, 1974 offer might have lulled a TransOcean stockholder into believing that such price would be paid if he would wait out the offer for tenders of stock at $12 a share.

█ As to references in the offer to TransOcean's activities in on-shore drilling as well as in the North Sea, I am of the opinion that the language in the September 30, 1974 circular offering plainly and adequately reported the available facts on such subjects.

While it has been held that an attempt to freeze out a stockholder's right to acquire additional shares of corporate stock is improper regardless of the fairness of the price fixed, *Bennett v. Breuil Petroleum Corporation*, 34 Del.Ch. 6, 99 A.2d 236 (1953), and that shares may not be issued solely to preserve or to gain corporate control, *Condec Corporation v. Lunkenheimer Company*, Del.Ch., 230 A.2d 769 (1967), as well as that as a general principle corporate action, though technically correct and in compliance with the Delaware Corporation Law, may not be undertaken for an inequitable purpose, *Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971), the principles set forth in such cases are not, in my opinion, applicable here.

█ In other words, in the case at bar, Vickers, the holder of the majority of the outstanding stock of TransOcean, having embarked on what I consider to be a legitimate course of action, namely that of acquiring the publicly held outstanding minority shares of TransOcean at a price in excess of the current market, went about such project by making a clearly adequate disclosure of the relevant facts and circumstances surrounding such transaction. And the fact that plaintiff and others of her class might have had a right to an appraisal of their shares had Vickers elected to proceed to acquire the minority shares of TransOcean by way of merger does not prevent the selection of another course of action designed to achieve substantially the same result, *Orzeck v. Englehart*, Del. Supr., 41 Del.Ch. 361, 195 A.2d 375 (1963), and *Baron v. Wolf*, Del.Ch., Unreported Opinion (January 15, 1976).

█ It should be noted at this juncture, I believe, that unlike a proposed merger from which a corporation may seek to withdraw in the event of overwhelming objection by affected stockholders, an offer to buy publicly held shares of stock, whether made by an outsider or a majority stockholders as here, constitutes a basically firm commitment [4] to buy for the period

---

4. The offeror reserved the right to withdraw its offer in the event of the filing of an action such as the one at bar, an option it did not take. Other conditions related to catastrophies such as the suspension of trading, a banking moratorium, or war or its like, none of which came to pass.

stipulated in the offer or as later extended. There is no provision in the Delaware Corporation Law and it would not be appropriate under equitable principles, in my opinion, to bind an offeror in a situation such as the one at bar to an implied commitment to pay an additional consideration for tendered shares in an amount made up of the difference between the price offered and what might ultimately be found to be the intrinsic value of the shares in question. I therefore decline to grant plaintiff and her class a right not provided for in the Delaware Corporation Law or cognizable under general equitable principles.

Having found neither actionable coercion nor fraudulent misrepresentations to have been made in connection with the September 30, 1974 offer here in issue, on notice, an order may be presented granting judgment for the defendants and dismissing the complaint.