## HILL et al. v. ST. LOUIS COKE & IRON CORPORATION et al.

### No. 744.

District Court, D. Delaware.

Sept. 11, 1934.

Ford W. Thompson, of St. Louis, Mo., for intervening plaintiffs.

Daniel O. Hastings and Harry W. Lunger (of Hastings, Stockly & Duffy), both of Wilmington, Del., for defendants.

NIELDS, District Judge.

This suit was brought by minority stockholders of the St. Louis Coke & Iron Corporation (hereinafter referred to as the Coke Corporation) against that company and St. Louis Gas & Coke Corporation (hereinafter referred to as the Gas Corporation). All of the original plaintiffs have withdrawn, and the case is being prosecuted by other minority stockholders who have intervened and adopted the allegations of the bill of complaint as their own.

The present plaintiffs are holders of less than 2 per cent. of the common stock of the Coke Corporation. That company was in financial difficulties. Harley L. Clarke, president of Utilities Power & Light Corporation, acquired a large majority of the outstanding preferred and common stock of the Coke Corporation. He organized the Gas Corporation for the express purpose of taking over the assets and property of the Coke Corporation. Afterwards the Coke Corpo-

ration elected a new board of directors. That board authorized the sale of all of its property and assets to the Gas Corporation. This sale was approved by 99 per cent. of the owners of the first preferred stock; the only stock then having voting power. Provision was made for payment to common stockholders of $20 a share for their stock.

Plaintiffs attack the sale, and particularly the value of $20 a share placed upon the common stock. They allege that the managing directors of the Coke Corporation at the time of the sale were under the dominance of, and held their office by appointment and selection of, Utilities Power & Light Corporation, majority stockholder of the Coke Corporation, and that the transfer of the assets of the Coke Corporation to the Gas Corporation was in violation of the General Corporation Law of Delaware and constituted a fraud upon the minority stockholders.

Further, the bill alleges that on the basis of fair market value at the time of the transfer the outstanding shares of common stock of the Coke Corporation had a book value "of about One hundred and Ninety Dollars ($190) a share," and that "capitalizing the value of the outstanding common stock of the Iron [Coke] Corporation on the basis of twenty times annual earnings thereon (which is a conservative valuation basis for common stock of a public utility corporation such as the Iron Corporation) and without considering the vast potentialities of the plant and assets of said Iron Corporation and the community which it served in the public utility field for increased earnings in succeeding years, said common stock of the Iron Corporation had a reasonable value of about Five Hundred Dollars ($500.00) a share at the time of said transfer and conveyance of the plant and assets of the Iron Corporation to the Gas Corporation."

Defendants reply that the sale was in accordance with law, without fraud, and for a fair consideration.

A brief recital of the history of the Coke Corporation and of the circumstances under which the Gas Corporation became the purchaser of its assets is necessary. In April, 1917, the predecessor of the Coke Corporation, called St. Louis Coke & Chemical Company, was organized. During the years 1917 to 1920 it acquired land in Madison county, Ill., and erected thereon its by-product coke oven and blast furnace plant. Operations were started in February, 1921. By June, 1921, its capital outlays and obligations consisted of $6,404,000 8 per cent. first mort-

gage gold bonds; $2,076,600 8 per cent. debenture bonds; $5,275,000 8 per cent. cumulative preferred stock of the par value of $100 per share; and 200,000 shares of common stock of the par value of $5 per share, a total of $14,755,600. From its organization in 1917 until April, 1923, the operations of the company were conducted at a loss. In April, 1923, it was reorganized. Under the reorganization, its obligations and capital outlays, then aggregating $17,427,365, were converted into securities of St. Louis Coke & Iron Company, a Maine corporation, as follows: $6,488,000 6 per cent. first mortgage bonds; $3,099,200 7 per cent. cumulative preferred stock of the par value of $100 per share; and 95,703 shares of common stock of the par value of $5 per share; and $160,000 bond interest, aggregating $10,225,715. For the year 1923 the reorganized company made a profit of $413,323.59. By September, 1924, the company was again in financial difficulties, and on September 7, 1924, on the petition of creditors and stockholders, a receiver was appointed in Illinois. The receiver operated the company until November, 1925, when its assets were sold to a committee of creditors and bondholders. These assets were transferred by the committee to a new corporation then organized under the laws of Delaware under the name of Midland Coke & Iron Corporation, which afterwards, by change of name became the defendant St. Louis Coke & Iron Corporation. For the assets thus acquired the Coke Corporation issued the following securities: 68,188 shares of first preferred stock of the par value of $100 per share; 10,224 shares of second preferred stock of the par value of $100 per share; 51,133 shares of common stock of the par value of $5 per share—a total capital of $8,096,865. During the first year of its existence this company showed fair earnings. By the end of 1926, however, its current liabilities exceeded its current assets by approximately $500,000. During the first three months of 1927 the Coke Corporation again showed fair earnings, but during the next three months it suffered substantial losses. At the time of the sale to the defendant Gas Corporation, the Coke Corporation's current liabilities exceeded its current assets by approximately $600,000. In June, 1927, it was in financial distress. Notes in the aggregate amount of $2,700,000 were falling due within a few days. There was no cash with which to pay them, and it was known that no further extension would be granted. It could not hope to finance itself by the sale of additional securities. There was little cash, and the auditor's report and treasurer's report showed that to continue operations over a further period of a few months in 1927 would need at least $732,000 additional cash.

Realizing the impending financial situation, certain large stockholders brought the matter to the attention of Harley L. Clarke, president of Utilities Power & Light Corporation, in the fall of 1926, and sought to interest him in its reorganization. After some investigation, Clarke became interested. Active negotiations started in March, 1927. Utilities Power & Light Corporation was a large public utility holding company. At the time it owned a controlling interest in Laclede Gas Light Company and Laclede Power & Light Company, two utility companies operating in St. Louis, Mo., just across the river from the plant of the Coke Corporation. These two companies were very large users of gas and electric current. The Coke Corporation for many years had been trying to sell its surplus gas and electric current to the Laclede Companies, but without success.

The Coke Corporation had been able to sell only a very small quantity of the gas it produced. The bulk of it was bled into the air and was a total loss. Clarke, however, was in a position to negotiate contracts with the Laclede Companies for the purchase by those companies of the surplus electric current and surplus gas produced by the Gas Corporation. Long-term contracts were negotiated. Obviously these contracts would be a source of considerable revenue. It was estimated the Gas Corporation would profit thereby to the extent of $1,000,000 a year.

As another step in the contemplated reorganization, Clarke caused an investigation to be made with respect to the value and prospective earnings of the Coke Corporation's plant and assets. He employed the well-known engineering firm of Stone & Webster. That firm fixed the replacement value as of April, 1927, less depreciation, at approximately $18,000,000. About the same time Clarke, on behalf of the Utilities Corporation, also employed H. A. Brassert & Co., a nationally known firm of engineers in estimating earnings of a business of the character of the Coke Corporation. Their investigation was carried on for several months before June, 1927. In their report they stated, "We estimate a possible profit after selling and administration expense when in full operation of $1,880,000 per year." This estimated profit was based upon

the "proposed scheme of operation which provides for the sale of all surplus coke gas to the Laclede Gas Light Company and all surplus power produced from blast furnace gas to the Laclede Power & Light Corporation," and also "an assumed price of $20.00 per ton of pig iron and with sales of surplus coke at current prices."

On behalf of the Utilities Company, Clarke began taking options on stock of the Coke Corporation in February, 1927. He continued to do so until by the latter part of June, 1927, he had acquired about 99 per cent. of the first preferred stock, 75 per cent. of the second preferred stock, and 77 per cent. of the common stock. Thereupon he opened negotiations with certain bankers in New York with a view of marketing bonds to be secured by a mortgage upon the plant and assets to be acquired by a new corporation to be formed under the laws of Delaware to take over the plant and assets of the Coke Corporation. These negotiations resulted in an understanding with the bankers to underwrite an issue of $10,000,000 of bonds of the Gas Corporation when, as, and if issued.

The defendant Gas Corporation was incorporated under the laws of Delaware June 25, 1927. The certificate of incorporation provided for the issuance of 50,000 shares of preferred stock and 50,000 shares of common stock without par value. Ten shares of common stock were subscribed for by the incorporators. These subscriptions were shortly afterwards assigned to the Utilities Corporation. At the first meeting of the board of directors of the Gas Corporation, the following resolution was unanimously adopted: "Resolved, that this corporation shall sell to Utilities Power & Light Corporation forty-nine thousand nine hundred and ninety (49,990) shares of its common capital stock without par value, being the balance of its unissued capital stock, at and for a consideration of Forty-nine Thousand Dollars ($49,000)."

At the same meeting the following proposal was submitted to the Gas Corporation:

"The Undersigned, Utilities Power & Light Corporation hereby makes you the following offer:

"(a) To sell and transfer to your Company all of the shares of the first preferred, second preferred and common stock of St. Louis Coke & Iron Corporation (a Delaware Corporation) now owned or hereafter acquired by the undersigned. It is understood that you will take the necessary steps to acquire all of the property, assets and effects of said St. Louis Coke & Iron Corporation.

"(b) To pay to your Company an amount in cash sufficient so that upon the acquisition by your Company of the property, assets and effects of said St. Louis Coke & Iron Corporation, subject to the payment of its debts, liabilities and obligations, and the issuance by you of the $10,000,000 in principal amount of First Mortgage Sinking Fund Gold Bonds, 6% Series due 1947, and the 50,000 shares of $7 Dividend Preferred Stock, of your Company, in accordance herewith, the financial situation of your Company will be as represented by the pro forma balance sheet hereto attached and made a part hereof and marked 'Schedule A,' subject only to changes in the current assets position of your Company as a result of the operations of the said properties in regular course subsequent to March 31, 1927.

"In consideration of the foregoing your Company shall do the following:

"1. Issue to or upon the order of the undersigned $10,000,000 principal amount of First Mortgage Sinking Fund Gold Bonds to be secured by a First Mortgage and Deed of Trust, dated June 1, 1927, to The Chase National Bank of the City of New York, Trustee, substantially in the form herewith submitted to you, said bonds to be issued on the basis of a consideration of the principal amount thereof, plus accrued interest.

"2. Issue to or upon the order of the undersigned or to the purchasers procured by it, 50,000 shares of the $7. Dividend Preferred Stock of your Company without par value, fully paid and non-assessable.

"This proposal when accepted by you shall constitute a contract between us."

The proposal was accepted by the Gas Corporation. In accordance therewith, the Utilities Corporation assigned to the Gas Corporation 67,795 shares of first preferred, 8,540 shares of second preferred, and 43,026 shares of common stock of the Coke Corporation, and, in addition, agreed to pay to the Coke Corporation $2,750,000 to retire outstanding notes of the Coke Corporation and provide $500,000 in cash to be used as working capital by the Gas Corporation and $359,656.19 to liquidate the outstanding and undelivered first and second preferred and common stocks of the Coke Corporation at the prices of $105.83, $105, and $20 per share, respectively. In exchange for the

foregoing, the Gas Corporation issued to the Utilities Corporation 50,000 shares of its preferred stock and $10,000,000 of its first mortgage bonds. The bonds were sold by the Utilities Corporation to partly reimburse it for the amount paid by it for the stock of the Coke Corporation transferred by it to the Gas Corporation.

June 28, 1927, the Gas Corporation acquired the assets and assumed the liabilities of the Coke Corporation, and as consideration therefor the Gas Corporation surrendered to the Coke Corporation for cancellation all the shares of stock of the Coke Corporation that the Gas Corporation had acquired from the Utilities Corporation, plus sufficient cash to liquidate the remaining outstanding preferred and common stocks of the Coke Corporation at the price of $105.83 per share for the first preferred, $105 per share for the second preferred, and $20 per share for the common stock. The Gas Corporation also paid to the Coke Corporation the sum of $2,700,000 to enable the Coke Corporation to pay outstanding bank loans, and assumed all the other liabilities of the Coke Corporation amounting to $504,-254.70. It also provided the Gas Corporation with $500,000 for working capital. The total consideration thus paid by the Gas Corporation for the assets of the Coke Corporation aggregated $12,495,875.74.

■ Section 64a of the General Corporation Law of Delaware (Rev. Code 1915, § 1978A, as added by 29 Del. Laws, c. 113, § 17, and amended by 36 Del. Laws, c. 135, § 19) provides: "Every corporation organized under the provisions of this Chapter, may at any meeting of its Board of Directors, sell * * * all of its property and assets * * * upon such terms and conditions and for such consideration * * * as its Board of Directors shall deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of the holders of a majority of the voting stock issued and outstanding, provided, however, that the Certificate of Incorporation may require the vote or written consent of the holders of a larger proportion of the stock issued and outstanding."

The certificate of incorporation of the Coke Corporation required "the consent and authorization of the holders of at least two-thirds in interest of the First Preferred Stock then outstanding, given in person or by proxy, either in writing or at an annual meeting * * * for effecting or validating * * * the sale or lease of all or substantially all of its property." The certificate further provides that for three years from and after November 6, 1925, the first preferred stock shall have the sole and exclusive voting power, and that not until the expiration of that period, and even then unless cumulative dividends of 7 per cent. have been paid in full on the first and second preferred stock, shall the common stock have voting power. Dividends on both the first and second preferred stock became cumulative from October 1, 1926. No dividends were ever paid on the common stock. The voting power, therefore, at the time of the transaction in question, was vested in the first preferred stockholders. The owners of over 99 per cent. of that class of stock consented in writing to the terms of sale as presented to the board of directors of the Coke Corporation and to a sale pursuant thereto. The requirements of the statute and of the certificate of incorporation being fully satisfied, the only ground upon which plaintiffs can base a claim for relief is that of fraud. Allied Chem. & Dye Corp. v. Steel & Tube Co., 14 Del. Ch. 1, 120 A. 486.

■ The crucial question is whether the Coke Corporation received fair consideration for its assets. It is unnecessary to analyze the mass of balance sheets, reports, and financial statements in evidence. It is sufficient to point out a few outstanding facts. The balance sheet of the Coke Corporation as of March 31, 1927, only three months before the transaction in question, showed a value of approximately $15 a share for the common stock. The report of Stone & Webster indicated that the assets were worth about $18,000,000. One report of Brassert & Co. placed the value at $13,750,000. A second report of Brassert & Co. placed the market value, as distinguished from value on a basis of reproduction cost less depreciation, at only $8,724,398. Looking at the matter from the standpoint of earnings, the situation is no more favorable to the common stockholders. The net earnings during the best period in the history of the Coke Corporation were not sufficient to pay dividends on the first and second preferred stock. Nothing was left for the common stock. At the time of the sale, the company had no cash working capital, but had notes

due banks in the sum of $2,700,000 which it could not pay and, which could not be extended. If it was to continue. operations, its immediate needs called for additional cash in at least the sum of $732,000. It had suffered a substantial net loss during the three months immediately preceding the sale. The record fully supports the statement in defendant's brief "that the figure of $20 per share for the common stock, four times par, was more than generous and that the consideration paid by the Gas Corporation for the assets of the Coke Corporation was a fair consideration."

The fallacy of plaintiff's case lies in the contention that the value of the common stock of the Coke Corporation should be determined, not upon the value of the assets of that corporation at the time of the sale and reorganization, but upon the value of such assets at that time, plus the value imparted to those assets by Mr. Clarke and the Utilities Corporation in refinancing and taking over the management of the corporation, plus the value of the two contracts to be obtained by the Gas Corporation with the Laclede Companies for the sale of surplus gas and electrical energy which the Coke Corporation theretofore had never been able to sell, and from which contracts the profits to the Gas Corporation were estimated at $1,000,000 a year, plus the profit to be realized by the Gas Corporation from a 100 per cent. operation of its plant and the sale of all pig iron produced at the price of $20 a ton, plus the benefit to be derived from the furnishing to the Gas Corporation by the Utilities Corporation of working capital in the sum of $500,000. The statement of such a proposition is its sufficient answer. That such prospective earnings were founded only on hopes and expectations is demonstrated by the record.

It was but a short time before the Gas Corporation was again in financial difficulties and placed in the hands of a receiver. It should also be noted that there is no proof of any fraud or misrepresentation on the part of Clarke or the Utilities Corporation or that either made a dollar profit out of the transaction. On the other hand, the uncontradicted testimony of Clarke is, "What the Utilities Light & Power Corporation got out of it was a loss of approximately $600,000 plus the privilege of loaning the company about a million dollars from the time of its acquisition."

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½ (28 USCA § 723).

The bill of complaint and petitions of intervention must be dismissed.