**CRAWFORD et al. v. MEXICAN PETRO-LEUM CO., LTD., OF DELAWARE et al.**

**No. 296.**

Circuit Court of Appeals, Second Circuit.

Aug. 11, 1942.

John B. Doyle, of New York City (William Reiss and Jerome H. Shapiro, both of New York City, on the brief), for appellants.

David Paine, of New York City (Kellogg, Emery & Inness-Brown, Ethelbert Warfield, and J. Fearon Brown, all of New York City, on the brief), for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is a minority stockholders' suit against Mexican Petroleum Co., Ltd., of Delaware (Mexpet), Pan American Petroleum & Transport Co. (Pan Am), and certain individual officers and directors. The purpose of the suit is to set aside a transfer from Mexpet to Pan Am on the ground of fraud and breach of fiduciary obligations. It may be noted at the outset that this particular transfer is a minor aspect of the complicated reorganization of Pan Am recently in litigation in New York courts. See Blaustein v. Pan American Petroleum & Transport Co., 174 Misc. 601, 21 N.Y.S. 2d 651, modified 263 App.Div. 97, 31 N.Y. S.2d 934. The complete story of that reorganization is not necessary for an understanding of the phase before us, and we shall refer only briefly to the broader implications of the various transactions.

The immediate claim is that Pan Am purchased the domestic holdings of Mexpet at a price which was too low. Since Pan Am owned 98.6 per cent of the stock of Mexpet and the two corporations had interlocking officers and directors, it is alleged that there was fraud in the transaction and a breach of fiduciary obligations. The district court found that neither allegation was proved and dismissed the complaint on the merits. This appeal by the stockholders followed.

It is claimed at the outset that the action must fail because plaintiffs Crawford and Crawford Holding Company, Inc., acquired their Mexpet stock subsequent to the transfer and thus cannot meet the requirements of Equity Rule 27, now Rule 23(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and that plaintiffs Russo and Kestler, as well as plaintiffs Crawford, are barred by laches. The suit was commenced by Crawford in 1936, four years after the transfer took place, and Russo and Kestler joined in two years after that. We agree with the district court, however, that it is preferable to place the decision on the merits notwithstanding the probability that the procedural objections are well taken.

Prior to 1932, Mexpet was a holding company composed of Mexican Petroleum Corporation (Maine), a marketing company, Mexican Petroleum Corporation of Louisiana, Inc., and Mexican Petroleum Corporation of Georgia, two asphalt refineries, Huasteca Petroleum Company, a holding company in Mexico, and Mexican Petroleum Company (Cal.), a producer and refiner also in Mexico. It also held 49.8 per cent of the voting trust certificates of Petroleum Heat and Power Company, a distributor of fuel oil. Pan Am, in addition to holding 98.6 per cent of Mexpet stock, owned a group of producing and refining companies operating in Venezuela and Aruba in the Dutch West Indies, and a marketing company operating in different territory from Mexpet of Maine. It also owned 50 per cent of the stock of the American Oil Company (Amoco), a retail outlet under contract with Mexpet of Maine for supplies of gasoline. Apart from these holdings, Pan Am owned and operated a fleet of tankers. Standard Oil Co. of Indiana owned from 90 to 95 per cent of the stock of Pan Am at this time.

In 1932, it became evident that domestic producers of oil would be successful in inducing Congress to put a tariff on oil which would effectively cut off imports of foreign oil. This meant that Pan Am would either have to break into the foreign export markets or sell its foreign properties, for it could not operate profitably under the import duty. Breaking into the foreign markets was turned down both because of the expense, estimated at $50,000,000, and because of the European cartels. When it came to a question of sale, one of the likely purchasers was the Standard Oil Co. of New Jersey, which was already engaged in

a European business. Accordingly, officials of Standard of New Jersey, Standard of Indiana, and Pan Am entered into what was known as the Sea View agreement.

Under this agreement, Standard of Indiana agreed to cause Pan Am to effect a reorganization whereby a new corporation, Pan American Foreign Corporation, was to receive all foreign holdings of Pan Am in return for the stock to be issued by Pan Am Foreign. This Pan Am Foreign stock was to be distributed to Pan Am stockholders, which meant Standard of Indiana, holder of over 90 per cent of Pan Am stock. Standard of New Jersey agreed to purchase the Pan Am Foreign stock from Standard of Indiana for a sum to be computed on the basis of 87.15 per cent of the book values of the various Pan Am Foreign holdings after certain minor adjustments.

As a corollary to the Sea View agreement it was necessary for Pan Am and Mexpet to make some preliminary transfers. Standard of New Jersey was unwilling to take over all of Mexpet for fear of running afoul of anti-trust laws so far as domestic holdings were concerned. Therefore, it was necessary for Mexpet to convey its holdings to Pan Am so that Pan Am could segregate foreign from domestic holdings. It is this contract that is assailed as fraudulent.

Under the Mexpet contract all Mexpet domestic subsidiaries were sold to Pan Am, together with the stock holding in Petroleum Heat & Power, for $11,245,000.79, also determined by book value, though in this instance taken on a 100 per cent basis. There were, however, several adjustments among the constituent companies, such as an unfavorable balance of $9,610,295.54 due from Mexpet of Maine to a subsidiary of Pan Am. Without these adjustments, of course, the net worth of Mexpet would have been higher.

Two other agreements may be mentioned to make the story complete. As mentioned above, there was a contract between Mexpet of Maine and Amoco, whereby Amoco was guaranteed a supply of gasoline. This contract had over a year and a half to run from the date of the Sea View agreement. If that agreement went through, Mexpet of Maine would be without a source of gasoline, because it obtained its supply from the foreign subsidiaries of Mexpet and Pan Am. To meet this, Standard of New Jersey made a special contract to supply Mexpet of Maine with the gasoline necessary to

meet the requirements of the Amoco contract. The final agreement is the one which was involved in the Blaustein case, supra. The Blausteins owned 50 per cent of Amoco, and quite naturally saw that because of the Sea View agreement Amoco might eventually be without any gasoline supply. They threatened to block the transfer from Pan Am to Standard of New Jersey, and the upshot was that they sold out to Pan Am for about 30 per cent of Pan Am stock, together with an agreement that Standard of Indiana would undertake to rebuild Pan Am into an integrated company.

This is the general picture into which the transfer from Mexpet to Pan Am fits. The plaintiffs seek, of course, to characterize the entire picture as an attempt in the large to squeeze out Mexpet stockholders. In view of the small amount of Mexpet stock held outside of Pan Am and the fact that this transfer was such a minor item in the whole transaction, it is fantastic to believe that all the negotiations were aimed at this result. The plaintiffs point to specific items, such as methods of depreciation, however, and seek in this way to establish that the over-all price for the Mexpet subsidiaries was too low.

Neither plaintiffs nor defendants have made clear what law they think governs, whether the law of the forum, which is New York, the law of the place of the contract, which is New Jersey, or the law of the state of incorporation, which is Delaware. We do not think it essential to settle this, for under the strongest statement of the duties of officers, directors, and majority stockholders which can be found we are satisfied that plaintiffs cannot prove their case. Perhaps the strongest recent statement of the duties of majority stock interests appears in Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281. There the Court said: "A director is a fiduciary. * * * So is a dominant or controlling stockholder or group of stockholders. * * * Their powers are powers in trust. * * * Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also its inherent fairness from the viewpoint of the corporation and those interested therein." See, also, Lebold v. Inland Steel Co., 7 Cir., 125 F.2d 369; Kavanaugh v. Kavanaugh

Knitting Co., 226 N.Y. 185, 193, 123 N.E. 148; Blaustein v. Pan American Petroleum & Transport Co., supra, 31 N.Y.S.2d at pages 956, 957; Allied Chemical & Dye Corp. v. Steel & Tube Co. of America, 14 Del.Ch. 1, 18, 120 A. 486; Robotham v. Prudential Ins. Co. of America, 64 N.J.Eq. 673, 53 A. 842, 849; Note, 51 Yale L.J. 1034.

Even assuming that the burden of establishing the "inherent fairness" and "good faith" of the transaction was on the defendants here (cf. Cleary v. Higley, 154 Misc. 158, 170, 171, 277 N.Y.S. 63, affirmed 246 App.Div. 698, 284 N.Y.S. 989), we think plaintiffs still have not made a case. In 1932, at the depth of the depression, Pan Am was faced with disastrous disruption of its business because of the proposed import duty on oil. Mexpet of Maine was under contract to deliver gasoline to Amoco for another year and a half at a price at which even then it was losing money. Unless the deal with Standard of New Jersey went through, fulfillment of the contract was likely to be even more onerous. Faced with a situation such as this, it is not reasonable to say, post hoc, that perhaps dismemberment of the units would have been better, that perhaps Pan Am should have asked for bids for Mexpet's domestic properties, or that appraisers should have been appointed to determine the value of the domestic properties before any deal was consummated. Were the minority holdings here larger, cf. Lebold v. Inland Steel Co., supra, a more critical scrutiny of the details of the negotiations might perhaps be justified. With only a small bit of stock outstanding and with so many larger issues at stake, it is unreal to believe that the value of Mexpet property was purposely understated.

Moreover, it is hard to believe that book value of Mexpet domestic properties was too low and that Pan Am officials knew it, in the face of the fact that Pan Am conveyed the foreign holdings to Standard of New Jersey for 87.15 per cent of book value. If plaintiffs are correct in their allegations as to the inadequacy of book value, Pan Am officials lost even more in the transfer of foreign holdings to Standard of New Jersey. We should not assume that book values were not uniformly set up or that Pan Am officials were cutting off their noses to spite their faces. It may be, of course, that other factors required a lower price from Standard and that using a fraction of book value was the method of adjustment. If so, it demonstrates that the situation confronting Pan Am was not favorable, and Mexpet, which was largely dependent on Pan Am for continued life, had to suffer from the same unfavorable condition.

Plaintiffs' attempt to demonstrate inadequacy of price, assuming that alone is a badge of fraud, must fail. Aside from a discredited witness who testified as to the value of some minor assets, their chief reliance is on improper depreciation, exclusion of good will and going concern value, and failure to consider Mexpet's value as a unit in the integrated Pan Am created after the intervention of the Blausteins. There may be some reason to believe that depreciation was high because generous depreciation is a common American business practice. See Hearings before the TNEC, 1939, Pt. 9, Savings and Investment. But that is not enough to avoid this transaction. The practice is general and was in use long before the transfer now assailed was contemplated. Furthermore, the date of the transfer, 1932, indicates that replacement would probably be cheaper, which in itself offsets overly large depreciation practices. Also, since the depreciation practice is common, prospective purchasers are likely to use it in computing value, and to balk at paying a higher price obtained by independent valuation.

Nor can much be made of good will and going concern value. Mexpet was losing money just prior to the Sea View agreement. It stood to be even worse off after the import duty became effective. Under these circumstances good will and going concern value, elusive and intangible at best, become even more hypothetical. In fact, too close consideration might have led to a belief that book value was too high. As for the Mexpet units in the integrated Pan Am setup, their value rests apparently on the work of the Blausteins in fighting for integration. There is no indication that otherwise Pan Am would have followed such a line. It is difficult to see, therefore, how the transfer from Mexpet to Pan Am can be assailed because a third party later enhanced the value of the Mexpet assets.

Other arguments along similar lines are made by plaintiffs, but we think the points discussed demonstrate that there is sufficient evidence to support the district court's findings of fact and consequent exoneration of defendants.

Affirmed.