# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CORNERSTONE | ) | |
| THERAPEUTICS INC. | ) | CONSOLIDATED |
| STOCKHOLDER LITIGATION | ) | Civil Action No. 8922-VCG |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  June 5, 2014
Date Decided:  September 10, 2014

Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, and Jeremy J. Riley, of Rigrodsky & Long, P.A., Wilmington, Delaware; OF COUNSEL:  Ira M. Press, J. Brandon Walker, and Melissa A. Fortunato, of Kirby McInerney LLP, New York, New York, Shane Rowley, of Levi & Korsinsky LLP, New York, New York, and Chet B. Waldman and Joshua H. Saltzman, of Wolf Popper LLP, New York, New York, Attorneys for the Plaintiffs.

Donald J. Wolfe, Jr., Kevin R. Shannon, and Christopher N. Kelly, of Potter Anderson & Corroon LLP, Wilmington, Delaware; OF COUNSEL:  Anthony M. Candido, Robert C. Myers, and John P. Alexander, of Clifford Chance US LLP, New York, New York, Attorneys for Defendants Cornerstone Therapeutics Inc., Michael Enright, Christopher Codeanne, James H. Harper, Michael Heffernan, and Laura Shawver.

Kurt M. Heyman, Patricia L. Enerio, and Dawn Kurtz Crompton, of Proctor Heyman LLP, Wilmington, Delaware, Attorneys for Defendants Craig A. Collard and Robert M. Stephan.

GLASSCOCK, Vice Chancellor

This case involves the acquisition of the minority interest in a corporation by a controlling stockholder, in a manner alleged not to be entirely fair. Because the controller is a fiduciary that stood on both sides of this transaction, the controller will have to demonstrate on a developed record that the transaction was entirely fair to the minority (or that mechanisms were in place approximating an arm's-length transaction, in which case its burden may be reduced). The Amended Complaint also pleads breaches of fiduciary duty against directors of the company appointed as members of a special committee formed to negotiate with the controller and other disinterested directors who voted to recommend the transaction, as well as a claim against the company for aiding and abetting directors' breaches of fiduciary duty. This Memorandum Opinion addresses those defendants' Motions to Dismiss.

## I. FACTS

### 1. The Parties

Cornerstone Therapeutics Inc. ("Cornerstone," or the "Company") is a publicly-traded Delaware pharmaceutical company, headquartered in Cary, North Carolina.[1] Cornerstone's business "focuse[s] on commercializing products for the hospital, niche respiratory, and related specialty products" industry by "acquiring companies and . . . registration-stage products that fit within its focus areas," and

---

[1] The facts cited herein are taken from the Verified Amended Complaint unless otherwise indicated.

"marketing [those] products through its wholly-owned subsidiary, Aristos Pharmaceuticals, Inc."[2] Craig A. Collard is the Company's founder and, prior to the February 3, 2014 merger at issue in this litigation (the "Merger"), was its CEO. As of February 3, 2014, Cornerstone's board of directors consisted of Collard, Anton Giorgio Failla, Robert M. Stephan, Marco Vecchia, James A. Harper, Laura Shawver, Christopher G. Codeanne, Michael D. Enright, and Michael Heffernan.

In May 2009, Chiesi Farmaceutici S.p.A. ("Chiesi"), a privately-held Italian drug manufacturer, purchased 11,902,741 shares of Cornerstone common stock, obtaining a controlling position in the Company, pursuant to a "series of agreements with the Company and certain of its stockholders, including Collard,"[3] in exchange for approximately $15.5 million in cash and a ten-year distribution license for Chiesi's "Curosoft" product, "a treatment for respiratory distress syndrome in premature infants."[4] In connection with that transaction, Cornerstone and Chiesi entered into a "Governance Agreement," which granted Chiesi certain majority stockholder rights and placed restrictions on Chiesi's ability to make purchases and transfers of Cornerstone stock. According to the Plaintiffs, "[a]s part of the 2009 Chiesi Transaction, the Company agreed that Chiesi was permitted to purchase additional shares from the Company, other stockholders, or on the

---

[2] Am. Compl. ¶ 33.
[3] *Id.* ¶ 49.
[4] *Id.* ¶ 37.

market, such that Chiesi would be able to maintain its beneficial ownership of 51% of Cornerstone's outstanding common stock."[5]

In December 2010, Chiesi purchased an additional 450,000 shares of Cornerstone stock from entities controlled by Collard, after which Chiesi owned 55.51% of Cornerstone's outstanding stock. In March 2012, pursuant to a Stock Purchase Agreement, Chiesi purchased an additional 1,443,913 shares, increasing its interest in Cornerstone to above 60%. In June 2012, Cornerstone and Chiesi entered into a senior secured loan facility, pursuant to which Chiesi obtained a right to convert certain debt to common stock, and became the beneficial owner of 65.4% of Cornerstone common stock.

2. The Special Committee

On February 18, 2013, Chiesi delivered to the Cornerstone board a letter (the "Offer Letter") "offering to acquire all of the outstanding shares of common stock of Cornerstone not owned by Chiesi at a price range of $6.40 to $6.70 per share."[6] The Offer Letter explained that "[d]uring the last few months we have conducted an extensive review of Cornerstone based on publicly available information, our own deep experience in the pharmaceutical industry and consultations with our outside advisors," and that, "[a]t $6.40 to $6.70 per share, our proposal represents a 20% to 25% premium over [the] Friday, February 15, 2013 closing price of

---

[5] *Id.* ¶ 38.
[6] *Id.* ¶ 45.

$5.35."[7]  The Offer Letter did not condition Chiesi's offer on the approval of a majority of the minority stockholders.

As noted above, in February 2013, Cornerstone's board consisted of nine directors. Of those nine directors, three had current or prior employment relationships with Chiesi. Specifically, Failla served at that time as Head of Business Development at Chiesi; Vecchia served "as Head of Legal and Corporate Affairs at Chiesi and as a member of the board of directors of several Chiesi subsidiaries;"[8] and Stephan had "served as Vice President and Secretary from 1997 to 2012 and [had] served as a director from April 2009 to 2012 of Chiesi Pharmaceuticals, Inc., USA, a subsidiary of Chiesi."[9]

In response to Chiesi's Offer Letter, the Cornerstone board formed a special committee of five directors—Harper, Shawver, Codeanne, Enright, and Heffernan (the "Special Committee"). Although the Defendants contend that the members of the Special Committee were disinterested and independent, the Plaintiffs disagree. Rather, the Plaintiffs allege that Harper and Shawver lacked independence in evaluating Chiesi's offer due to their involvement with Phenomix Corporation, Inc. ("Phenomix"), a company that in 2009 signed a $191 million agreement with Chiesi. At that time, Harper was a director, and Shawver was the CEO and a

---

[7] *Id.* ¶ 50.
[8] *Id.* ¶ 18.
[9] *Id.* ¶ 17.

5

director, of Phenomix, but by 2013 Phenomix was defunct and existed only to wind up its affairs. Although the Phenomix deal was consummated in 2009—several years prior to Chiesi's February 2013 Offer Letter—and Phenomix was defunct by that time, the Plaintiffs contend that Harper and Shawver's relationships demonstrate that neither individual could have acted independently in evaluating the transaction. Further, the Plaintiffs allege that Codeanne, Enright, and Heffernan lacked independence because those directors were "hand-picked by Collard," who sold stock to Chiesi in May 2009 and December 2010.[10]

The Plaintiffs additionally contend that "[t]he Special Committee [held] only illusory power," as "Chiesi made clear from the outset that it was not interested in divesting its controlling interest or considering alternative strategic transactions."[11] The Plaintiffs point to Chiesi's Offer Letter, which concluded with the statement that "we are interested only in acquiring the remaining shares of Cornerstone and we have no interest in a disposition of our controlling interest or in considering any other strategic transaction involving Cornerstone."[12]

Upon its formation in February 2013, the Special Committee obtained Clifford Chance US LLP as legal counsel and Lazard as its financial advisor. The Plaintiffs challenge the Special Committee's decision to retain Lazard, in light of

---

[10] *Id.* ¶ 47.
[11] *Id.* ¶ 46.
[12] *Id.* ¶ 45.

6

"the fact that Lazard informed the Special Committee that it had current and recent past financial advisory relationships with, or connections to, Chiesi."[13] Specifically, the Plaintiffs find fault in the Special Committee's accepting that "(i) an employee of Lazard S.r.l. . . . is a member of the board of directors of Chiesi; (ii) an analyst at Lazard Italy is the nephew of the Chairman of Chiesi; and (iii) bankers at the Lazard group (including a senior member of the proposed team for this engagement) had solicited Chiesi."[14]

### 3. Chiesi and the Special Committee Negotiate a Deal

According to the Defendants, Chiesi's Offer Letter "prompted a vigorous, arm's-length negotiation process between Chiesi and the Special Committee, which lasted nearly seven months,"[15] and during which "the Special Committee met 37 times . . . and received six separate detailed financial presentations from its independent financial advisor."[16] Upon receiving Chiesi's Offer Letter, the Special Committee reviewed Cornerstone's most recent management forecasts as well as Lazard's financial analysis of the Company. Based on those figures, the Special Committee concluded that "a value range of $11.00 to $12.00 per Company share was fair for the minority stockholders."[17] As a result, on April 26, 2013, at the

---

[13] *Id.* ¶ 51.
[14] *Id.*
[15] Company's Op. Br. in Supp. of Mot. to Dismiss at 9.
[16] *Id.* at 9 n.6.
[17] Am. Compl. ¶ 52.

instruction of the Special Committee, Lazard informed Chiesi's financial advisor that the Committee considered Chiesi's $6.40 to $6.70 proposed range to be inadequate, but that the Committee would consider a deal with Chiesi at $12.00 per share. On May 2, 2013, Chiesi counter-offered at $8.25 per share and "indicated that Chiesi was not willing to go any higher."[18] In addition, Chiesi's financial advisor reminded the Special Committee that "Chiesi, as the majority stockholder of the Company, had the right to remove and replace all of the non-Chiesi directors and the Company's senior management team."[19]

Despite the threat of removal, four days later, on May 6, 2013, the Special Committee rejected Chiesi's $8.25 offer and made a counter-proposal at $11.00 per share. According to the Plaintiffs, two days later, Chiesi's CEO called Enright, the Special Committee's Chairman, "to express his disappointment and frustration with the Special Committee's $11.00 per share counter-proposal, and further threatened to enter into a 'cooling-off' period or to terminate discussions altogether."[20]

On May 9, 2013, Cornerstone released its financial results for the first quarter of 2013, which were "below the first quarter performance figures projected

---

[18] *Id.* ¶ 54.
[19] *Id.* (typeface altered from original).
[20] *Id.* ¶ 55 (emphasis added).

in the Company's financial forecast."[21]   As a result, the Special Committee provided Lazard with management's updated financial forecast.  Following a May 16, 2013 telephonic meeting with Lazard, "the Special Committee directed Lazard to [further] revise the financial projections contained in the [updated forecast] downward to reflect certain negative adjustments . . . and to create an updated preliminary financial analysis."[22]   The Plaintiffs allege that, "[b]ased on those adjustments by the Special Committee to the financial forecast, which had a downward impact on the range of values in Lazard's updated preliminary financial analyses, and the Special Committee's fear that Chiesi would terminate discussions if it did not lower its $11.00 proposal price, the Special Committee instructed Lazard to make a counter-proposal of $10.25 per share."[23]   However, at that time, the Special Committee also requested that Chiesi permit Lazard to solicit interest from third-party acquirers.  Chiesi rejected the Special Committee's $10.25 offer on May 29, 2013, and informed the Special Committee that it was unwilling to consider any third-party offers.

Weeks later, on June 11, 2013, Cornerstone received a letter from a competitor, Exela Pharma Sciences, LLC ("Exela"), "advis[ing] the Company that it was seeking regulatory approval for an injectable drug that would directly

---

[21] *Id.* ¶ 56.
[22] *Id.* ¶ 57.
[23] *Id.*

9

compete with one of Cornerstone's products, Cardene I.V.," and "alleg[ing] that the patents associated with Cardene I.V. were invalid, unenforceable, and/or would not be infringed by Exela's product."[24] Because it was unclear whether those patents would be enforceable, and what impact that uncertainty had on the business, the Special Committee considered structuring a transaction with Chiesi to include a contingent value right; the Committee ultimately decided, however, that such a structure was unworkable. Instead, in light of the uncertainty surrounding the enforceability of Cornerstone's Cardene I.V. patent, the Special Committee approached Chiesi with a revised offer of $9.75 per share. On August 5, 2013, Chiesi counter-offered at $9.25. On August 9, 2013, the Special Committee met with Lazard to discuss the Company's second quarter results and Chiesi's $9.25 offer. Lazard advised that the offer "would be a good result, but that the Special Committee should continue to negotiate to obtain a higher price."[25]

On September 11, 2013, representatives of the Special Committee and Chiesi met and agreed in principle to an acquisition at $9.50 per share. Over the next several days, the parties negotiated an agreement (the "Merger Agreement"), which ultimately conditioned the Merger on the approval of a majority of the minority stockholders. On September 15, 2013, the Special Committee convened with directors Collard and Stephan, and Lazard opined that "$9.50 per share was

---

[24] *Id.* ¶ 59.
[25] *Id.* ¶ 63.

fair from a financial point of view to the Company's stockholders."[26]  The Special Committee then unanimously approved the Merger Agreement.  Later the same day, the full board met to consider the transaction.  Failla and Vecchia recused themselves, while Stephan and Collard voted in favor of the Merger Agreement.

The Company filed its preliminary proxy recommending the Merger on October 17, 2013.  A definitive proxy was filed on December 26, 2013.  A special stockholder meeting was convened on January 13, 2014, adjourned to solicit additional proxies, and reconvened on February 3, 2014.  The Merger Agreement was approved by more than 80% of the minority stockholders on that date.

### 4. Procedural History

The Plaintiffs filed Complaints in this and related actions in September and October 2013.  Those Complaints were consolidated on October 22, 2013, and on December 11, 2013, the Plaintiffs filed an Amended Complaint.  The Amended Complaint asserts three Counts: Count I for breach of fiduciary duty against the Special Committee, Collard, and Stephan (collectively, the "Director Defendants"), as well as the affiliated directors Failla and Vecchia; Count II for breach of fiduciary duty against Chiesi and Chiesi's merger subsidiary; and Count III for aiding and abetting breaches of fiduciary duty against Cornerstone.  On January 31, 2013, the Company and the Director Defendants (*not* including the affiliated

---

[26] *Id.* ¶ 65.

11

directors) moved to dismiss Counts I and III of the Amended Complaint. I heard oral argument on those Defendants' Motions to Dismiss on June 5, 2014. The remainder of this Memorandum Opinion addresses the merits of those Motions.

## II. STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, this Court must accept as true all well-pled allegations contained in the plaintiff's complaint, and draw all reasonable inferences in the plaintiff's favor.[27] "If the well-pled factual allegations of the complaint would entitle the plaintiff to relief under a reasonably conceivable set of circumstances, the [C]ourt must deny the motion to dismiss."[28] "Nonetheless, the Court need not accept conclusory allegations that are unsupported by specific facts or draw unreasonable inferences in favor of [the plaintiff]."[29]

## III. ANALYSIS

The Defendants in this action have moved to dismiss Count I against the Director Defendants and Count III against the Company. I address those Motions below.

---

[27] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[28] *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *6 (Del. Ch. Apr. 30, 2014).

[29] *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at *3 (Del. Ch. May 30, 2014).

### 1. Special Committee and Approving Disinterested Directors

This litigation involves the acquisition of a company by a controlling stockholder, negotiated by a special committee and recommended to the minority by the board of directors, but not at the outset of negotiations made contingent on a non-waivable condition requiring the approval of a majority of the minority stockholders. Since a controlling stockholder stands on both sides of this transaction, and since the Amended Complaint adequately alleges that the Merger was not entirely fair to the minority,[30] the transaction is subject *ab initio* to entire fairness review, as the Defendants concede.[31] The transaction, therefore, must be reviewed on a developed factual record with respect to the controller and the directors affiliated with the controller. This Motion to Dismiss, however, involves *only* the disinterested directors who served on the Special Committee appointed to negotiate with the controller, and the disinterested directors who voted in favor of the transaction.

---

[30] *See Monroe Cnty. Emps.' Retire. Sys. v. Carlson,* 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) ("Delaware law is clear that even where a transaction between the controlling shareholder and the company is involved—such that entire fairness review is in play—plaintiff must make factual allegations about the transaction in the complaint that demonstrate the absence of fairness."); *In re Boston Celtics Ltd. P'ship S'holders Litig.*, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) ("[I]t is also necessary for the plaintiff to allege specific items of misconduct that demonstrate unfairness, in order to survive a motion to dismiss."); *Solomon v. Pathe Commons Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995) ("Even in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair.").

[31] Oral Arg. Tr. 8:16–19.

The Plaintiffs and the Director Defendants face two areas of disagreement. First, the parties dispute the pleading standard for facially disinterested directors; whether breach of duty on the part of those directors who negotiated with the controller or otherwise facilitated the transaction needs to be specifically pled; and whether an exculpation provision adopted pursuant to Section 102(b)(7) must be ignored at the motion-to-dismiss stage, to await consideration after the transaction has been reviewed for entire fairness at trial. Second, assuming that individualized breaches of duty on the part of the negotiating disinterested directors must be pled in the complaint, the parties dispute whether the Plaintiffs have sufficiently alleged that the Director Defendants breached their duty of loyalty in negotiating and approving the Merger with Chiesi.

The Plantiffs contend that, where the applicable standard of review is entire fairness, the Court should decline to dismiss director defendants based on a plaintiff's failure to plead a non-exculpated breach of duty, even where those directors are not themselves interested in the transaction, because "entire fairness review exists, in part, to allow for thorough discovery and fact-finding in order to 'uncover' possible violations of the duty of loyalty by 'facially independent directors' who may be unduly influenced by a controller."[32] The Defendants, citing this Court's decision in *DiRienzo v. Lichtenstein*, reject that contention,

---

[32] Pl.'s Br. in Opp'n to Mot. to Dismiss at 21–22 (citing *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 28 (Del. Ch. 2014)).

14

arguing instead that "the pendency of entire fairness claims against *the controlling stockholder* [does not] relieve the Plaintiffs of their obligation to plead a cognizable claim against each of the Special Committee members," and that, "[t]o the contrary, '[t]o burden the Special Committee with proving entire fairness, [the Plaintiffs] must allege sufficiently that the committee members breached a non-exculpated fiduciary duty.'"[33]  The Defendants' argument is by no means without persuasive force, as I discuss below.   I find, however, that where, as here, entire fairness is the standard of review *ab initio*, controlling case precedent directs that negotiating and facilitating directors must await a developed record, post-trial, before their liability is determined.

The Plaintiffs, citing the *Emerald Partners* line of cases and this Court's recent decision in *In re Orchard Enterprises*,[34] contend that, because the entire fairness standard governs the validity of the transaction and the controlling stockholders' liability at trial, I must deny the Director Defendants' Motion to Dismiss, and that "a trial must be held to determine whether the transaction was entirely fair, and if it was not, to 'identify the breach or breaches of fiduciary duty upon which liability for damages will be predicated in the *ratio decidendi* of its

---

[33] Company's Reply Br. in Supp. of Mot. to Dismiss at 4 (emphasis added) (citing *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *11 (Del. Ch. Sept. 30, 2013)).
[34] 88 A.3d 1 (Del. Ch. 2014).

15

determination that entire fairness has not been established.'"[35]   The Director Defendants point out, however, that this Court has dismissed disinterested directors, pre-trial; explaining in *In re Southern Peru Copper Corp.* that:

> The entire fairness standard ill suits the inquiry whether *disinterested directors* who approve a self-dealing transaction and are protected by an exculpatory charter provision authorized by 8 *Del. C.* § 102(b)(7) can be held liable for breach of fiduciary duties.  Unless there are facts suggesting that the directors consciously approved an unfair transaction, the bad faith preference for some other interest than that of the company and the stockholders that is critical to disloyalty is absent.  The fact that the transaction is found to be unfair is of course relevant, but hardly sufficient, to that separate, individualized inquiry. In this sense, *the more stringent, strict liability standard applicable to interested parties such as [the controlling stockholder] is critically different than that which must be used to address directors such as those on the Special Committee.*[36]

Both *Orchard* and *Southern Peru,* however distinct their points of view, involved motions for summary judgment upon a developed factual record, and they are not controlling in the instant context of a motion to dismiss.  Any difference between those two cases involves the timing of the inquiry into director liability, either before or after a finding, post-trial, of entire fairness; neither, as does this case, involves the sufficiency of the pleadings of the complaint. I have, however, considered the rationales of these cases closely here.

---

[35] Pl.'s Br. in Opp'n to Mot. to Dismiss at 24 (citing *In re Orchard Enters., Inc.*, 88 A.3d at 37).
[36] *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 787 n.72 (Del. Ch. 2011) (emphasis added).

The lack of congruity in our case law with respect to transactions subject to entire fairness is, I believe, best explained by examining the difference of, on the one hand, the theory by which fiduciaries who benefit from a transaction involving property of their principals are held strictly liable in rescission or disgorgement if the transaction is not scrupulously fair to the principals and, on the other hand, the theory under which other, disinterested fiduciaries may be liable for damages for the same transaction *if* they facilitated the transaction in a way that breached their fiduciary duties. In other words, fiduciaries who used the corporate machinery to facilitate a self-interested transaction are strictly liable[37] absent entire fairness; disinterested fiduciaries may also be liable, but only if they breached a duty.

To explain this, it is helpful to examine the underpinnings of applying entire fairness review. Directors control the corporation on behalf of the stockholders. Controlling stockholders also exercise power over the corporation they control, which belongs, in part, to others—the (non-controlling) stockholders. As such, both directors and controllers are fiduciaries for those stockholders and are accordingly constrained to act with fidelity toward them. Most severely constrained are dealings between a corporate fiduciary and the corporation itself, where the fiduciary stands on both sides of the transaction, implicating the

---

[37] I use the term "strict liability" in this Memorandum Opinion in the same sense it was used in *Southern Peru*; a fiduciary that directs a corporate transaction in which it is interested is liable to the stockholders unless the transaction is entirely fair, without further proof of fault on the part of the fiduciary.

fiduciary's duty of loyalty. Early common law prevented corporate directors from transacting business with a corporation for which they served.[38] In the twentieth century, that standard relaxed to permit a fiduciary to transact with the corporation; our Courts clarified that such self-interested transactions are not void, but voidable, such that "where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration."[39] That entire fairness standard—applied in Delaware since at least the 1920s[40]—is premised on the idea that, ordinarily, court review of director decision-making is circumscribed by the deferential business judgment rule, but where a director is interested in the transaction, that presumption cannot apply and the Court must substantively review the interested decision for fairness to the stockholders.[41] Absent fairness, the

---

[38] *See, e.g.*, *Wardell v. Union Pac. R. Co.*, 103 U.S. 651, 658 (1880) ("It is among the rudiments of the law that the same person cannot act for himself and at the same time, with respect to the same matter, as the agent of another whose interests are conflicting. . . . Directors of corporations, and all persons who stand in a fiduciary relation to other parties, and are clothed with power to act for them, are subject to this rule; they are not permitted to occupy a position which will conflict with the interest of parties they represent and are bound to protect.").

[39] *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599 (1921).

[40] *See Lofland v. Cahall*, 118 A. 1, 3 (Del. Ch. 1922) (citing as a "general principle[] of law and equity" that has not been "seriously questioned," the premise that "[d]irectors of a corporation are trustees for the stockholders, and their acts are governed by the rules applicable to such a relation, which exact of them the utmost good faith and fair dealing, especially where their individual interests are concerned"); *Keenan v. Eshleman*, 2 A.2d 904, 908 (Del. 1938) ("[D]ealing as they did with another corporation of which they were sole directors and officers, they assumed the burden of showing the entire fairness of the transaction.").

[41] *See Nixon v. Blackwell*, 626 A.2d 1366, 1375–76 (Del. 1993) ("The entire fairness analysis essentially requires 'judicial scrutiny.' In business judgment rule cases, an essential element is the fact that there has been a business decision made by a disinterested and independent

18

conflicted transaction can be set aside, or the benefiting fiduciary forced to disgorge any unfair benefits of the transaction.[42] This is consistent with the treatment of self-dealing fiduciaries in other settings, such as trusts and estates.[43]

As stated above, in certain circumstances, the common law imposes fiduciary duties on controlling stockholders as well as directors. In *Allied Chemical & Dye Corp. v. Steel & Tube Co. of America*,[44] this Court made clear that our common law has imposed fiduciary duties on controlling stockholders for decades. In describing the source of those duties, that decision explains:

> that under certain circumstances these [fiduciary] relations [between a majority and minority stockholder] are clear. No one, of course questions the fiduciary character of the relationship which the directors bear to the corporation. The same considerations of fundamental justice which impose a fiduciary character upon the

corporate decisionmaker. When there is no independent corporate decisionmaker, the court may become the objective arbiter." (citations omitted)).

[42] *See, e.g.*, *In re S. Peru Copper Corp. S'holders Derivative Litig.*, 52 A.3d 761, 813–19 (Del. Ch. 2011) (considering whether to remedy the self-dealing transaction at issue by either "cancel[ing] or requir[ing] the defendants to return to [the company] the shares that [the company] issued in excess of [the] fair value" or granting "rescissory damages in the amount of the present market value of the excess number of shares that [the defendants] hold as a result of [the company] paying an unfair price in the Merger").

[43] *See, e.g.*, *In re MAXXAM, Inc.*, 659 A.2d 760, 775 (Del. Ch. 1995) ("Rescission is a permissible equitable remedy in cases where a self-dealing fiduciary breaches its duty of loyalty. . . . In cases where rescission is found to be impractical, rescissory damages may be an appropriate substitutionary form of equitable relief."); *Stegemeier v. Magness*, 728 A.2d 557, 565–66 (Del. 1999) (holding that ordinarily the trustee's self-dealing would "be voidable by the beneficiaries," but that, since the subsequent sale of the purchased land to third parties has made rescission impossible, the appropriate remedy is damages in the amount of "profit made by the trustee"); RESTATEMENT (THIRD) OF TRUSTS § 100 (2012) ("A trustee who commits a breach of trust is chargeable with (a) the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered; or (b) the amount of any benefit to the trustee personally as a result of the breach.").

[44] 120 A. 486 (Del. Ch. 1923).

19

relationship of the directors to the stockholders will also impose, in a proper case, a like character upon the relationship which the majority of the stockholders bear to the minority. When in the conduct of the corporate business, a majority of the voting power in the corporation join hands in imposing its policy upon all, it is beyond all reason and contrary, it seems to me, to the plainest dictates of what is just and right, to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the directors in their relation to all the stockholders. *Ordinarily, the directors speak for and determine the policy of the corporation. When the majority of the stockholders do this, they are, for the moment, the corporation.* Unless the majority in such case are to be regarded as owing a duty to the minority such as is owed by the directors to all, then the minority are in a situation that exposes them to the grossest frauds and subjects them to most outrageous wrongs.[45]

The ability of a controlling stockholder to determine the policies of the corporation—often described as control over the "corporate machinery"[46]—is two-fold: First, controlling stockholders may exercise an ability to authorize a transaction by stockholder vote, and second, controlling stockholders may exercise the ability to control the composition of the board.[47]

---

[45] *Id.* at 491 (emphasis added).

[46] *See Singer v. Magnavox Co.*, 380 A.2d 969, 979–80 (Del. 1977), *overruled by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) ("[T]hose who control the corporate machinery owe a fiduciary duty to the minority in the exercise thereof over corporate powers and property, and the use of such power to perpetuate control is a violation of that duty."); *Roland Int'l Corp. v. Najjar*, 407 A.2d 1032, 1034 (Del. 1979), *overruled by Weinberger*, 457 A.2d 701 ("The fiduciary duty is violated when those who control a corporation's voting machinery use that power to 'cash out' minority shareholders, that is, to exclude them from continued participation in the corporate life, for no reason other than to eliminate them.").

[47] *Compare Weinberger v. UOP, Inc.*, 409 A.2d 1262, 1265 (Del. Ch. 1979) ("The rationale underlying the decisions in *Singer* and *Tanzer* is deeply rooted in our corporate law. It is based upon the principle that whenever a majority shareholder . . . undertakes to exercise an available statutory power so as to impose the will of the majority upon the minority, such action gives rise to a fiduciary duty on the part of the majority shareholder to deal fairly with the minority whose

Controlling stockholders are fiduciaries to minority stockholders when exercising corporate control. The duty a controlling stockholder owes when it stands on both sides of the transaction—*i.e.*, where the controlling stockholder has a personal interest, as well as an interest as a fiduciary for the corporation—is to ensure that the transaction is entirely fair.[48] Permitting a controlling stockholder to partake in an interested transaction, but with the caveat that it must demonstrate the transaction is entirely fair, strikes a balance between protecting the interests of minority stockholders (including their interest in receiving maximum value for their shares, which sale to a controller may achieve), and preserving the voting rights of majority stockholders.[49]

---

property interests are thus controlled."), *and id.* at 1266 (referencing a "use of corporate voting machinery by a majority shareholder so as to mandate a preconceived result"), *with Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 492 (Del. 1982) ("In *Sterling*, this Court recognized as a 'settled' rule of law in Delaware that a majority shareholder *and its director designees* occupy a fiduciary relationship to the minority shareholders from which springs a duty of fairness in dealing with the minority's property interests." (emphasis added)), *and In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *21 (Del. Ch. Sept. 19, 2008) ("In determining whether a blockholder who has less than absolute voting control over the company is a controlling stockholder such that the entire fairness standard is invoked, the question is whether the blockholder, 'as a practical matter, possesses a combination of *stock voting power and managerial authority* that enables him to control the corporation, if he so wishes.'" (emphasis added)), *and Savin Bus. Machs. Corp. v. Rapifax Corp.*, 1978 WL 2498 (Del. Ch. Feb. 15, 1978) (noting that controlling stockholder controlled the corporation's board of directors), *and Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971) (explaining that control "may be exercised directly or through nominees"), *and Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. Ch. 1952) ("Plaintiffs invoke the settled rule of law that Hilton as majority stockholder of Mayflower *and the Hilton directors as its nominees occupy*, in relation to the minority, a fiduciary position in dealing with Mayflower's property." (emphasis added)).

[48] *See Sterling*, 93 A.2d at 109–110.

[49] *See In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271, at *8 (Del. Ch. Oct. 21, 1988) ("[A]lthough [the controlling stockholder] is a controlling shareholder who bears fiduciary obligations, he also has rights that may not be ignored. His rights include a right to

21

Under ordinary circumstances, the burden to demonstrate entire fairness remains with the fiduciary—the controlling stockholder—to demonstrate that a transaction in which it stood on both sides is entirely fair. That is because:

> In the absence of divided interests, the judgment of the majority stockholders and/or the board of directors, as the case may be, is presumed made in good faith and inspired by a bona fides of purpose. But when the persons, be they stockholders or directors, who control the making of a transaction and the fixing of its terms, are on both sides, then the presumption and deference to sound business judgment are no longer present. Intrinsic fairness, tested by all relevant standards, is then the criterion.[50]

However, beginning in the 1970s and '80s, our courts considered shifting the burden of demonstrating entire fairness to the plaintiff, and ultimately shifting the standard of review from entire fairness to business judgment in transactions where the controller ceded some, or all, of the control of the corporate machinery. The burden-shifting principle was first to crystallize. In *Weinberger v. UOP, Inc.*, our Supreme Court held that "[w]here corporate action has been approved by an informed vote of a majority of the minority shareholders . . . the burden entirely shifts to the plaintiffs to show that the transaction was unfair to the minority."[51] Eventually, this Court applied burden-shifting to transactions where a special

---

effectuate a transaction of this kind so long as the terms are intrinsically fair."); *Tanzer v. Int'l Gen. Indus, Inc.*, 379 A.2d 1121, 1124 (Del. 1977), *overruled by Weinberger*, 457 A.2d 701 ("In sum, for more than fifty years our Courts have held, consistent with the general law on the subject, that a stockholder in a Delaware corporation has a right to vote his shares in his own interest, including the expectation of personal profit, limited, of course, by any duty he owes to other stockholders.").

[50] *David J. Greene & Co. v. Dunhill Int'l, Inc.*, 249 A.2d 427, 430–31 (Del. Ch. 1968).

[51] *Weinberger*, 457 A.2d at 703.

committee of independent directors negotiates with a controller, so long as "the majority shareholder [does] not dictate the terms of the merger" and "the special committee [has] real bargaining power that it can exercise with the majority shareholder on an arms length basis."[52] The standard-shifting principle, meanwhile, was met with more resistance, and for a brief period of time this Court split on the issue.[53] In *In re Trans World Airlines, Inc. Shareholders Litigation*, Chancellor Allen found that the use of either a special committee of disinterested directors or a majority-of-the-minority stockholder vote not only shifts the burden to the plaintiff, but also, "when properly employed, [has] the judicial effect of making the substantive law aspect of the business judgment rule applicable."[54] Only two years later, however, in *Citron v. E.I. Du Pont de Nemours & Co.*, the Court backed away from this position, holding that entire fairness is the applicable standard of review regardless of whether either sanitizing mechanism was in place.[55] The *Citron* court reasoned that, although conditioning an offer on the approval of the minority stockholders may shift the burden of demonstrating entire fairness, this protection—even when used in conjunction with a disinterested

---

[52] *Rabkin v. Olin Corp.*, 1990 WL 47648, at *6 (Del. Ch. Apr. 17, 1990).

[53] The evolution of this area of law is well explicated in William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 BUS. LAW. 1287, 1306 (2001).

[54] *In re Trans World Airlines*, 1988 WL 11271, at *7.

[55] *Citron v. E.I. duPont de Nemours & Co.*, 584 A.2d 490, 501–02 (Del. Ch. 1990).

special committee to negotiate the transaction—does not warrant application of the business judgment rule, because:

> Parent subsidiary mergers . . . are proposed by a party that controls, and will continue to control, the corporation, whether or not the minority stockholders vote to approve or reject the transaction. The controlling stockholder relationship has the inherent potential to influence, however subtly, the vote of minority stockholders in a manner that is not likely to occur in a transaction with a noncontrolling party.[56]

Rather, the burden-shifting device merely provides an incentive for controlling stockholders to structure transactions that are more likely to be fair to, albeit imperfect for, the minority stockholders.[57]

In 1994, our Supreme Court in *Kahn v. Lynch* resolved the split in favor of the *Citron* interpretation, holding that "even when an interested cash-out merger transaction receives the informed approval of a majority of minority stockholders or an independent committee of disinterested directors, an entire fairness analysis is the only proper standard of judicial review," and further emphasizing that with respect to special committees in controlling stockholder transactions, "[p]articular consideration must be given to evidence of whether the special committee was truly independent, fully informed, and had the freedom to negotiate at arm's length."[58] Recently, our Supreme Court refined its view once more in *Kahn v. M*

---

[56] *Id.* at 502.
[57] *Am. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242 (Del. 2012).
[58] 638 A.2d 1110, 1117, 1120–21 (Del. 1994).

*& F Worldwide Corp.*, holding that a transaction structured *ab initio* on approval *both* by an empowered independent, disinterested committee of directors *and* by a fully informed majority of the minority stockholders is in fact entitled to deference under the business judgment rule.[59] Such a transaction becomes, in effect, an unconflicted, arm's-length transaction.[60] Looked at another way, in such a transaction the controlling stockholder has ceded that control; without control of the corporate machinery, with respect to that transaction it is no longer in a fiduciary relationship to the minority, and thus imposing entire fairness review and its accompanying strict liability would not be appropriate. Like any stockholder, absent the fiduciary duty that attaches with controller status, the erstwhile controller may act in its own self-interest.

As the case law cited above explains, where a controller stands on both sides of a transaction, it is subject to judicial remedy unless the transaction is entirely fair. Where a director stands on both sides of the transaction, she is similarly held to an entire fairness standard. Where the director is disinterested—has no financial stake—and negotiates or facilitates the transaction, she is not strictly liable for entire fairness as is an interested fiduciary. She may, however, be liable for breach

---

[59] 88 A.3d 635, 644 (Del. 2014).
[60] *See id.* at 645 ("[W]here the controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations and the shareholder vote, the controlled merger then acquires the shareholder-protective characteristics of third-party, arm's-length mergers, which are reviewed under the business judgment standard.").

25

of fiduciary duty if she has breached a non-exculpated duty in connection with the negotiation or facilitation of the transaction.[61] It is the fundamental difference in the type of potential liability of two different groups of fiduciaries—strict in the case of interested fiduciaries,[62] breach-based in the case of disinterested fiduciaries—that, I believe, has led to some lack of clarity in our case law.

To plead a case sufficient to withstand a motion to dismiss with regard to a stockholder who has transacted with the corporation, the plaintiff must merely plead facts raising an inference that the defendant stockholder is a controller and that the transaction was not entirely fair to the majority.[63] Such a matter must proceed to a trial at which the fairness of the transaction must be scrutinized. This case involves a separate question: What is the pleading standard for *disinterested directors* charged with a breach of fiduciary duty in connection with the same transaction? This question arises in a context in which it is unquestionable that interested parties will be held to entire fairness, and that disinterested director

---

[61] *See, e.g.*, *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 37 (Del. Ch. 2014) (determining that, in a case against independent directors protected by a Section 102(b)(7) exculpation provision, "[t]he director defendants can avoid personal liability for paying monetary damages only if they have established that their failure to withstand an entire fairness analysis is exclusively attributable to a violation of the duty of care." (quoting *Emerald Partners v. Berlin* (*Emerald Partners II*), 787 A.2d 85, 94 (Del. 2001)).

[62] *See supra* note 37.

[63] *Monroe Cnty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. Apr. 26, 2010); *see also In re Boston Celtics Ltd. P'ship S'holders Litig.*, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) ("[I]t is also necessary for the plaintiff to allege specific items of misconduct that demonstrate unfairness, in order to survive a motion to dismiss."); *Solomon v. Pathe Commons Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995) ("Even in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair.").

liability must ultimately be conditioned on a non-exculpated breach of duty; the question properly is, must specific facts raising an inference of a non-exculpated breach be pled with respect to each director defendant, or is it enough at the motion-to-dismiss stage to have pled that a disinterested director facilitated a transaction with a controller that was not entirely fair, upon which pleading the actions of the director, as regards her personal liability, must receive judicial scrutiny upon a fully developed factual record?

The Director Defendants, citing cases in this Court,[64] argue that the pleading standard for an interested fiduciary in a case subject to entire fairness cannot logically be applied to disinterested directors alleged to have breached a duty. With respect to those directors—including the moving Director Defendants here— they argue that particularized pleadings are required that, if true, raise an inference that such director breached a non-exculpated duty. There is much, in my view, to recommend such a pleading requirement. It is consistent with our treatment of directors alleged to have breached duties in non-controller-dominated transactions, where the requirement of specific pleading of non-exculpated breaches of duty allows management of the corporation to proceed unaffected by frivolous litigation

---

[64] *DiRienzo v. Lichtenstein*, 2013 WL 5503034 (Del. Ch. Sept. 30, 2013); *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761 (Del. Ch. 2011); *In re Fredericks of Hollywood, Inc.*, 2000 WL 130630 (Del. Ch. 2000), *aff'd sub nom.*, *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720 (Del. Ch. 1999); *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611 (Del. Ch. 1999).

and protects the directors' ability to pursue appropriate levels of risk without fear of liability, so long as their actions are consistent with the duty of loyalty. The Plaintiffs argue strenuously that considerations of conflicted loyalties are necessarily involved in controller transactions that make such a standard problematic in the controller context, but it is not entirely clear why this should be so. If the concern is potential entrenchment, that can be specifically pled; it does not appear to be a concern in this particular case, since the directors were not retained once the merger was complete.[65] If the concern is loyalty to the controller for having caused the director to remain in office in the past, that can be pled as well, but does not strike me as, without more, sufficient to sustain an inference that the director acted disloyally or negotiated in bad faith. All the other human relationship interests that may show a conflict of loyalty can be pled, if they exist, but doctrinally it seems insufficient to simply plead that that a director has participated in a transaction with a controller and thus an inference of disloyalty arises sufficient to sustain a complaint against her. In fact, such an automatic inference is problematic in several ways.

The automatic inference that a director negotiating or facilitating a transaction with a controller, without more, is a conflicted or disloyal director makes service on a special committee risky, and thus unattractive to qualified and

---

[65] The Amended Complaint does not allege whether the Director Defendants were aware that a merger would lead to their discharge, however.

28

disinterested directors.  Since directors who *refuse* to negotiate with a controller may also be breaching a fiduciary duty, but will receive the deferential business judgment review for such an alleged breach, the automatic inference creates an incentive to reject entering negotiations with controllers, a rejection that may cost minority stockholders value.[66]  The automatic inference seems inconsistent with our Supreme Court's recent opinion in *M & F Worldwide*, which suggests that a motion to dismiss may be granted where the transaction is conditioned *ab initio* on a majority-of-the-minority vote and is negotiated by a facially disinterested and independent special committee,[67] a proposition recently found persuasive in this Court.[68]  And the pleading rule the Defendants advocate would have little adverse effect on the minority stockholders, to whom the controller would still be liable

---

[66] Where the board is approached by a controller with an offer, the best interest of the stockholders may involve negotiation and consummation of a transaction.  Of course, it might also involve no transaction at all.  In theory, if the independent, disinterested directors inescapably face a trial for any challenged transaction with the controller, but know their actions will be reviewed under the business judgment rule if they refrain from the transaction, value-enhancing transactions will be forgone.  Whether this incentive is routinely sufficient to overcome the hidden incentives which may encourage such directors to strike a deal with a controller, in the real world, is an open question.

[67] Since a challenge to a controller transaction is subject to dismissal under the business judgment standard only where the controller ceded control *ab initio* to an effective vote of the majority of the minority, *and* where the transaction was negotiated on the part of the corporation by a disinterested, independent, and effective special committee, *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644–45 (Del. 2014), denying a motion to dismiss in such a case would logically require a specific pleading that the special committee was interested, not independent, or otherwise ineffective.

[68] *See Swomley v. Schlecht*, C.A. No. 9355-VCL, at 66:17–68:14 (Del. Ch. Aug. 27, 2014) (TRANSCRIPT) (applying the *M & F Worldwide* analysis in granting a motion to dismiss, reasoning that "the whole point of encouraging [the *M & F Worldwide*] structure was to create a situation where defendants could effectively structure a transaction so that they could obtain a pleading-stage dismissal against breach of fiduciary duty claims").

absent entire fairness. Such a pleading rule would not negate judicial scrutiny of the directors' actions in the context of the fairness of the transaction, which would occur whether or not they remained defendants.

The rule advocated by the Plaintiffs also has advantages, of course. Controller transactions are the corporate transactions where the possibility of divided director loyalties, often cryptic and unknowable at the pleading stage, is of greatest concern, as has been explicitly stated by this Court.[69] Holding directors who negotiated or facilitated the transaction as defendants until a post-trial determination of entire fairness has been made, for purposes of determining at that point whether those defendants have breached non-exculpated fiduciary duties, will undoubtedly result in justice being done in cases where, under the Defendants' pleading rule, faithless directors would not be called to account. This advantage comes with costs alluded to above, obviously. Such a trade-off is experienced in business-judgment rule cases as well, but the rate of director crypto-disloyalty or concealed interest is undoubtedly higher in controller cases.

---

[69] *See In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 37 (Del. Ch. 2014) ("A controlling stockholder transaction 'of course is the context in which the greatest risk of undetectable bias may be present.' Under controlling Delaware Supreme Court precedent, entire fairness governs a controlling stockholder transaction, even if a special committee of independent directors *or* a majority-of-the-minority vote is used, because of the risk that when push comes to shove, directors who appear to be independent and disinterested will favor or defer to the interests and desires of the majority stockholder." (quoting *Kahn v. Tremont Corp.* (*Tremont I*), 1996 WL 145452, at *7 (Del. Ch. Mar. 21, 1996)).

In any event, I am not free to make a policy determination here, because controlling precedent requires me to deny the Motion to Dismiss under these circumstances. As our Supreme Court in *Emerald Partners v. Berlin* ("*Emerald Partners II*") made clear, a controller transaction of the type at issue here is "subject to the entire fairness standard of review *ab initio*,"[70] and:

> [W]hen entire fairness is the applicable standard of judicial review, this Court has held that injury or damages becomes a proper focus only *after* a transaction is determined *not* to be entirely fair. *A fortiori*, the exculpatory effect of a Section 102(b)(7) provision only becomes a proper focus of judicial scrutiny after the directors' potential personal liability for the payment of monetary damages has been established.[71]

Correspondingly, the *Emerald Partners II* Court determined that "when entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only *after the basis* for their liability has been decided," that is, upon a fully-developed factual record and a determination of whether the transaction was entirely fair.[72]

I find, consistent with *Emerald Partners II*, that the Plaintiffs have made a sufficient pleading that a stockholder controlled the corporate machinery; that it used that machinery to facilitate a transaction of which it thus stood on both sides;

---

[70] 787 A.2d 85, 98 (Del. 2001).
[71] *Id.* at 93 (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1166 (Del. 1995)).
[72] *Id.* at 94.

31

that the transaction was not entirely fair to the minority; and that the Director Defendants negotiated or facilitated the unfair transaction. Such a pleading is sufficient, under controlling precedent, to withstand a motion to dismiss on behalf of the Director Defendants. Once the question of entire fairness is resolved after trial, and if I find the transaction not entirely fair, then the issue of whether the Director Defendants breached a non-exculpated duty may be addressed.

I note that, even under the Director Defendants' proposed pleading standard, their Motion to Dismiss would nonetheless be problematic here. The Plaintiffs' allegations in the Amended Complaint—that prior business relationships call into question the independence of the Director Defendants—are, to my mind, weak. The Amended Complaint also alleges, however, that an agent of the controller, frustrated by the hard bargaining of the Special Committee members, explicitly threatened their removal from office. In addition to the relevance of that allegation to fair process, the threat raises questions about the ability of the Special Committee to act in the best interest of the minority, unconflicted by self-interest. Because the pleading standard laid out in *Emerald Partners II* controls my decision in any event, I need not consider the matter further at the motion-to-dismiss stage.

### 2. The Company

Finally, Cornerstone moves to dismiss Count III of the Plaintiffs' Amended Complaint, which asserts that the Company "aided and abetted the Individual

Defendants in the breaches of their fiduciary duties."[73]  "A corporation cannot aid and abet violations by the fiduciaries who serve it."[74]  Accordingly, the Company's Motion to Dismiss Count III must be granted.

## IV. CONCLUSION

For the reasons discussed above, the Defendants' Motions to Dismiss are DENIED with respect to Count I and GRANTED with respect to Count III.  An appropriate Order accompanies this Memorandum Opinion.

---

[73] Am. Compl. ¶ 130.
[74] *In re Orchard Enters., Inc.*, 88 A.3d at 54.